WMW MACHINERY, INC. and General Bearing Corporation, Plaintiffs,

v.

WERKZEUGMASCHINENHANDEL GMBH IM AUFBAU, Werner P. Muender, Treuhandanstalt, and Bundesanstalt Fuer Vereinigungsbedingte Sonderaufgaben, Defendants,

v.

Seymour GUSSACK and WMW Machinery Company, Inc., Additional Counterclaim Defendants.

No. 95 Civil 1279 (BDP).

United States District Court, S.D. New York.

March 27, 1997.

---

Gerard A. Riso, Stein Riso Hapel & Jacobs, New York City, for Plaintiffs.

William M. Barron, Karl Geercken, Walter Conston Alexander & Green, New York City, for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

WMW Machinery, Inc. ("WMW") and General Bearing Corporation ("GBC") commenced this action against Werkzeugmaschinenhandel GmbH IM Aufbau ("WEMEX"), Werner P. Muender, the Treuhandanstalt ("Treuhand"), and the Bundesanstalt Fuer Vereiningungsbedingte Sonderaufgaben ("BVS") for breach of contract, breach of fiduciary duties, conversion, and tortious interference with contract. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, defendants' motion is granted in part and denied in part.

## BACKGROUND

This action arises out of damages allegedly sustained by plaintiffs WMW and GBC following the collapse of the former German Democratic Republic ("GDR" or "East Germany") and its reunification with the Federal Republic of Germany ("FRG"). Reunification altered not only the political face of the GDR, but also the economic and legal structure of the once communist state. The controversy in this case arises from the privatization of formerly state-owned enterprises in the aftermath of German reunification. Prior to reunification, in 1986 and 1987, WEMEX, one such enterprise, entered into contracts with WMW and GBC.[1] Disputes over the post-privatization status of those contracts, and the duties and rights flowing from them, form the basis of plaintiffs' complaint.

Before reunification, the GDR exercised monopoly control over the country's international commercial transactions. Thus, under

---

1. WEMEX was the successor to WMW Export–Import Berlin, a state created entity exclusively responsible for the import and export of East German machine tools, and the entity with which plaintiff had entered into those contracts. After reunification, WEMEX, a limited liability company, became the legal successor to WMW Export–Import. For this purposes of this opinion, "WEMEX" will be used to refer to both entities.

GDR law, "Export Trade Management Entities" or Aussenhandelsbetriebs ("AHB"), were the only entities in the GDR authorized to conduct export or import transactions. WEMEX was the AHB responsible for all export and import transactions for the GDR's machine tool industry and the "statutory commission agent"[2] of machine tool manufacturers in the GDR. Those manufacturers, in turn, were required to export their goods through WEMEX.

On January 1, 1986, WEMEX entered into a Joint Venture Agreement with GBC, pursuant to which both parties became equal owners of Alurop, S.A., a Panamanian company. Alurop's sole asset was its 100% ownership of plaintiff WMW, a New Jersey corporation.[3] The Joint Venture Agreement, in essence, prescribed the terms under which WEMEX would provide machinery to WMW for resale in the United States.

On December 8, 1987, WEMEX entered into a Commercial Agency Contract with WMW, which gave WMW the exclusive right to distribute in the United States and Canada machine tools manufactured in, and exported from, the GDR. The Commercial Agency Contract was structured so that the machine tool manufacturers themselves incurred no legal or contractual liability. In December 1989, WEMEX and WMW agreed to extend the term of the Contract through December 31, 1995.

The historic fall of the Berlin Wall on November 9, 1989 and the ensuing dismantling of the communist state brought about the dissolution of the government's monopoly power over the import and export of the country's goods and services. On June 17, 1990, prior to reunification, GDR's first freely elected government adopted the Treuhandgesetz ("Trusteeship Statute"), pursuant to which all former GDR enterprises, including WEMEX, were to be privatized. The Treuhand was the state agency created under the Trusteeship Statute to oversee the conversion of thousands of formerly state-owned entities into free-market enterprises. The Treuhand became the sole shareholder of WEMEX. The Treuhand's name was later changed to Bundesanstalt fuer Vereinigungsbedingte Sonderaufgaben ("BVS").[4] On October 3, 1990, Germany was reunified.

As a result of reunification, former East German manufacturers and producers were no longer required to deal through AHBs in order to sell their goods abroad. Thus, the East German machine tool manufacturers that had previously exported through WEMEX were free to establish new channels of distribution. Plaintiffs contend that the Treuhand, nonetheless, assured WMW that the Commercial Agency Contract was still valid, and that the Treuhand could take steps to require the manufacturers to continue to honor WMW's exclusive distribution rights.

Despite those assurances, many former East German manufacturers refused to distribute through WMW. According to plaintiffs, some manufacturers were closed down by the Treuhand, or ordered to change their product lines. Others were sold by the Treuhand to other companies, who used their own machine tool distributors. Others agreed to sell machine tools to WMW, but only on terms less favorable than those prescribed by the Commercial Agency Contract.

No longer the exclusive distributor of East German machine tools, WMW could not ensure its customers that service and parts could be supplied, or that the terms of its warranties to purchasers could be met. As a result, WMW's business decreased dramatically, which, in turn, caused the rapid devaluation of its inventory. By 1991, WMW ceased making payments to WEMEX under the Commercial Agency Contract on the ground that WEMEX had refused to ac-

---

2. As "statutory commission agent," WEMEX entered into export agreements with foreign buyers in its own name for the account of the manufacturers and received from the manufacturers, commissions determined by the GDR's Export Minister.

3. WMW, at the time the Joint Venture Agreement was entered into, was known as GMW Machin-

ery, Inc. GMW later changed its name to WMW Machinery, Inc.

4. Both the Treuhand and BVS are named defendants in this action. For the purposes of this motion, they will be referred to collectively as "the Treuhand."

knowledge the devaluation of WMW's inventory, WMW's growing losses, or the validity of the offsets and claims of WMW and GBC. In an attempt to resolve the problems surrounding its indebtedness to WEMEX, WMW reached two agreements with WEMEX. Because of the Treuhand's inaction, however, neither agreement was approved by the FRG's Ministry of Finance as was required for the agreements to be binding.

Meanwhile, WEMEX continued to export machine tools from a number of German manufacturers that had opted to continue to do business with WEMEX and WMW. On March 1991, WMW and WEMEX entered into an agreement ("the Heckert Agreement") to distribute goods manufactured by Heckert–Chemnitzer Werkzeugmaschinen ("Heckert"), a machine tool manufacturer of the former GDR. The agreement conferred upon WMW exclusive distribution rights in the United States and Canada for a large inventory of Heckert machinery. Disputes arising under the agreement were to be brought in the court "located at the principal place of business of the defendant." Heckert Agreement, Article 23.

Pursuant to the terms of the agreement, WMW purchased large quantities of machine tools from Heckert. Heckert, in turn, stored the machines for WMW in Germany until they could be shipped pursuant to WMW's instructions. Meanwhile, by June 1991, WMW owed WEMEX over $10 million for amounts due under the Commercial Agency Contract.

In January 1993, WEMEX was placed in liquidation and Werner P. Muender was its appointed liquidator and sole legal representative. In the fall of 1993, Werner P. Muender learned that machine tools that had been ordered by WMW, and had yet to be paid for, were being stored in a Heckert warehouse in Germany. Thus, in November 1993, Muender, in his capacity as liquidator of WEMEX's remaining assets, secured an *ex parte* order from a German court attaching the Heckert machines and preventing their shipment from Germany.[5] WEMEX sold the

attached machine tools to WMW, as well as other distributors. WMW paid WEMEX the full purchase price for the machines in order to obtain their release.

Plaintiffs subsequently brought this action against WEMEX for breach of contract, breach of fiduciary duties, and for declaratory judgment extinguishing or diminishing WMW's indebtedness to WEMEX. Plaintiff also sued Muender for wrongful conversion and breach of fiduciary duties and sued Treuhand for tortious interference with the Joint Venture Agreement and Commercial Agency Contract. Plaintiffs allege that since unification, defendants have acted to undermine the objectives of the Joint Venture Agreement and Commercial Agency Contract. Specifically, plaintiffs claim that defendants have failed to take measures to require the former East German machine tool manufacturers to comply with the Commercial Agency Contract; made statements disparaging WMW's management and marketing competence; and changed the names and missions of various machine tool factories, thereby diminishing the value of products WMW had in its inventory.

Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56 on the grounds that (1) the Court lacks subject matter and personal jurisdiction over the Treuhand; (2) the act of state doctrine bars all claims against the Treuhand and WEMEX; (3) the complaint fails to state a claim for breach of fiduciary duties; (4) there is no basis for Muender's personal liability; and (5) the German law defense of "changed circumstances" bars all of the claims against WEMEX and the Treuhand. In the alternative, defendants argue that plaintiffs' complaint should be dismissed in its entirety under the doctrine of *forum non conveniens*.

## DISCUSSION

### I. Foreign Sovereign Immunities Act

■ Defendants argue that the Treuhand is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. The FSIA provides the "sole

---

5. The legal basis for the attachment asserted by Muender was that the purchase conditions agreed to by WEMEX and WMW provided that all Heckert machines remained the property of WEMEX until the purchase price was fully paid.

basis for obtaining jurisdiction over a foreign state" in the courts of the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 240 (2d Cir.1994). The FSIA presumes that foreign states are immune from suit and permits federal courts to exercise jurisdiction over foreign states only if one of the exceptions set forth in the statute applies. 28 U.S.C. §§ 1604, 1605; *see Saudi Arabia v. Nelson*, 507 U.S. 349, 354, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 35 (2d Cir.1993), *cert. denied*, 510 U.S. 1071, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994).

The parties do not dispute, for the purposes of this motion, that the Treuhand qualifies as a "foreign state" as defined by the FSIA and is thus immune absent an applicable statutory exception.[6] Plaintiffs contend that subject matter jurisdiction over their claims against the Treuhand is conferred by the FSIA's "commercial activity" exception to sovereign immunity. *See* 28 U.S.C. § 1605(a)(2).

The "commercial activity" exception establishes jurisdiction over foreign states in cases where "the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). While the FSIA provides that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose," 28 U.S.C. § 1603(d), it

"leaves the critical term of 'commercial' largely undefined." *Nelson*, 507 U.S. at 359, 113 S.Ct. at 1478 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612, 112 S.Ct. 2160, 2165, 119 L.Ed.2d 394 (1992)).

The Supreme Court, however, has recently interpreted "commercial" in this context, holding that its meaning for the purposes of the FSIA "must be the meaning Congress understood the restrictive theory [of sovereign immunity] required at the time it passed the statute." *Nelson*, 507 U.S. at 359, 113 S.Ct. at 1479. Under this "restrictive" theory, foreign states are granted immunity with respect to their public or governmental acts, but not with respect to those that are private or commercial in nature. *See Nelson*, 507 U.S. at 359–360, 113 S.Ct. at 1479; *Weltover*, 504 U.S. at 614, 112 S.Ct. at 2165; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Thus, "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within that market," *Weltover*, 504 U.S. at 614, 112 S.Ct. at 2166, or "where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns,'" *Nelson*, 507 U.S. at 360, 113 S.Ct. at 1479 (quoting *Weltover*, 504 U.S. at 614, 112 S.Ct. at 2166), its actions are "commercial" within the meaning of the FSIA. *See also De Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985) (an activity is "commercial" if it is "of a type an individual would customarily carry on for profit"). Furthermore, because the commercial character of the act is determined by reference to its "nature" rather than its "purpose," *see* 28

---

**6.** Under the FSIA, the immunity extends to "agencies or instrumentalities" of a foreign state. 28 U.S.C. § 1603. An "agency or instrumentality," is defined as any entity

(1) which is a separate legal person and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or subdivision thereof, and (3) which is neither a citizen of a State of the United States nor created under the laws of any third country.

28 U.S.C. § 1603.

Here, the Treuhand and its successor BVS are clearly "agents or instrumentalities" of a foreign state within the meaning of the FSIA. The Treuhand was created and regulated by the laws of the GDR until the GDR reunited with the FRG, at which time it became a public organization of the FRG subject to regulation by that government. It was designated the authority by the GDR to oversee and conduct the privatization of business enterprises of the GDR. BVS was later created by the FRG as the successor to the Treuhand.

U.S.C. § 1603(d), the Court must consider "whether the particular actions that the foreign state performs.. are the type of actions by which a private party engages in 'trade and traffic or commerce,'" regardless of the motive behind them. *Weltover,* 504 U.S. at 614, 112 S.Ct. at 2166.

Defendants contend that the Treuhand did not engage in commercial activity that would subject it to this Court's jurisdiction, arguing that the Treuhand engaged in the purely sovereign function of converting former state-owned businesses into free market enterprises. Thus, according to defendants, the Treuhand acted purely as "market regulators" and not as "market participants."

The Treuhand's role as the entity responsible for privatizing state-owned businesses, however, more aptly describes Treuhand's "purpose," i.e. the reason why the foreign state engaged in the activity. What, as the statute explicitly provides and the case law instructs, is of considerably more significance is the "nature" or the "outward form of the conduct that the foreign state perform[ed] ." *Nelson,* 507 U.S. at 361, 113 S.Ct. at 1479. Its function as the former GDR's privatizing organ is, therefore, not determinative of whether the Treuhand's conduct was "commercial" under the FSIA. Rather, that determination requires the Court to look beyond generalized characterizations to the particular conduct that would entitle plaintiffs to relief under their theory of the case. *See* 28 U.S.C. § 1605(a)(2); *Nelson,* 507 U.S. at 356–57, 113 S.Ct. at 1477; *Texas Trading,* 647 F.2d at 308.

Here, plaintiffs have. alleged that the Treuhand tortiously interfered with the Joint Venture Agreement and the Commercial Agency Contract. In support of that allegation, plaintiffs claim that the Treuhand engaged in conduct that undermined both agreements. Specifically, plaintiffs allege that the Treuhand (1) required "the machine tool manufacturers that it now controls, and who are bound by the exclusive distribution rights contractually conferred upon WMW, to export and sell goods through distributors other than WMW," Complaint ¶¶ 56 and 59; (2) transferred ownership of the machine tool factories to WMW's competitors without advising those competitors of its exclusive distribution agreement with WMW, *see* Complaint ¶¶ 56 and 59; and (3) induced WMW to increase purchases from factories, despite Treuhand's knowledge that certain of those factories would soon be closed. *See* Complaint ¶ 59.

After reunification, the Treuhand became the "managing director of all the legally independent people's economic entities of the former GDR ... and became the owner of the shares of the capital companies arising out of the restructuring of the people's collective combines, companies, agencies and other legally independent economic entities." Muender Reply Decl. at 6. The Treuhand's actions, taken as the entity responsible for the former state-owned machine tool manufacturers certainly do not reflect the exercise of "powers peculiar to sovereigns." *See Nelson,* 507 U.S. at 360, 113 S.Ct. at 1479. The actions that form the basis of plaintiffs' claims reflect an exercise of "powers that can also be exercised by private citizens," and are akin to those that a controlling stockholder of a corporation might take as a "player in the private market." *Id.* (citing *Weltover,* 504 U.S. at 614, 112 S.Ct. at 2166); *Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for A.W. Galadari,* 12 F.3d 317, 328 (2d Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 1645, 128 L.Ed.2d 365 (1994). *Compare Weltover,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (issuance of freely negotiable, "garden-variety debt instruments held by private parties was commercial activity"); *Drexel Burnham,* 12 F.3d 317 (marshaling, managing, and liquidating plaintiff's assets was "commercial activity"); *Bryks v. Canadian Broadcasting Corp.,* 906 F.Supp. 204 (S.D.N.Y.1995) (broadcasting investigative news report was "commercial activity") *with Nelson,* 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (exercise of police power, including unlawful detention and torture, fell within a "peculiarly sovereign" function and was not a "commercial activity" under the FSIA). *See also* Restatement (Third) of the Foreign Relations Law of the United States § 451 (1987) [hereinafter "Restatement"] ("Under international law, a state or state instrumentality is immune from the jurisdic-

tion of the courts of another state except with respect to claims arising out of activities of the kind that may be carried on by private parties."). These principles teach that the Treuhand's activities, as those that a private individual would typically carry on for profit in the private sector, fall well within the meaning of "commercial" for the purposes of the FSIA.

Before this Court can exercise jurisdiction over the Treuhand, however, those activities must also be shown to have "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). "The relevant inquiry under the direct effect clause when plaintiff is a corporation is whether the corporation has suffered a 'direct' financial loss." *Texas Trading*, 647 F.2d at 312. An effect is "direct" if it follows "as an immediate consequence of the defendants ... activity," *id.*, 504 U.S. at 618, 112 S.Ct. at 2168, and it need not be "substantial" or even "foreseeable." *See Weltover*, 504 U.S. at 617, 112 S.Ct. at 2168.

Our Court of Appeals has applied a "legally significant acts" test to determine whether a "direct effect" occurred in the United States. *See Antares Aircraft*, 999 F.2d at 36. Under that test, for example, a contractual provision designating the United States as a place of performance is sufficient to vest jurisdiction under the FSIA because a breach of that contract is a "legally significant act" that occurred in the United States. *See Weltover*, 504 U.S. at 618–19, 112 S.Ct. at 2168–69. Similarly, in tort actions, the key consideration under the "legally significant acts" test is whether "that foreign tort had sufficient contacts with the United States to establish the requisite 'direct effect.' " *Antares Aircraft*, 999 F.2d at 36. The fact that the tort occurred overseas is not necessarily sufficient to deprive the federal courts of jurisdiction. *Id.* By the same token, loss to an American individual or entity from a foreign tort, standing alone, is insufficient to satisfy the direct effect requirement. *Id.*

Here, the foreign tort at issue involved the Treuhand's alleged interference with the Joint Venture Agreement and the Commercial Agency Contract. Both agreements prescribed WEMEX's obligation to export GDR machine tools to WMW in the United States. The contracting party due the obligation, WMW, was a New Jersey corporation with a principal place of business in New York. The financial loss sustained by WMW was an "immediate consequence" of the nonperformance of those contractual obligations, which, according to plaintiffs was deliberately caused by the Treuhand actions. Thus, I find that the "foreign tort" here had sufficient contacts with the United States and thereby had a "direct effect" on defendants' commercial activity within the meaning of the FSIA. *See Weltover*, 504 U.S. at 618, 112 S.Ct. at 2168 (finding that Argentina's unilateral rescheduling of bond payments has a "direct effect" within the meaning of 28 U.S.C. § 1605(a)(2) because New York was the place of payment).

Defendants contend that even if the Treuhand's conduct falls within the "commercial activity" exception to sovereign immunity, 28 U.S.C. § 1605(a)(5)(B) bars plaintiffs' claims against those defendants insofar as they allege interference with contract rights. Section 1605(a)(5), like the "commercial activity" exception, sets forth a general exception to sovereign immunity for the tortious activity of foreign states, but then provides an exception to that exception. Section 1605(a)(5) reads:

> A foreign state shall not be immune from jurisdiction of the courts in the United States or of the States in any case—

> (5) not otherwise encompassed in the [commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

>> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

28 U.S.C. § 1605(a)(5). The essence of defendants' argument is that this "exception to

the exception"—section 1605(a)(5)(B)—restricts the scope of the "commercial activities" exception to sovereign immunity established in section 1605(a)(2).

A plain reading of section 1605(a)(5) suggests, however, that the "tortious act" exception and "commercial activity" exception are mutually exclusive. The section explicitly embraces only those cases that are "not otherwise encompassed" in the commercial activity exception and, thus, provides an exclusion to immunity only in those actions based on noncommercial activity. *See Export Group v. Reef Indus., Inc.,* 54 F.3d 1466, 1473–77 (9th Cir.1995); *Tifa Ltd. v. Republic of Ghana,* 692 F.Supp. 393, 404–405 (D.N.J. 1988); *United Euram Corp. v. Union of Soviet Socialist Republics,* 461 F.Supp. 609, 612 (S.D.N.Y.1978); *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855 (S.D.N.Y.1978); *see also Amerada Hess,* 488 U.S. at 439, 109 S.Ct. at 691 (referring to section 1605(a)(5) as the "noncommercial torts exception"); *Ratnaswamy v. Air Afrique,* 1996 WL 507267, at *7 (N.D.Ill.1996).

Although our Court of Appeals has never explicitly decided whether the exceptions in 1605(a)(5)(B) restrict the "commercial activities" exception of section 1605(a)(2), it has construed the statutory language of the two clauses as "suggest[ing] that the commercial activity exception to jurisdictional immunity under (2) and the tort exception under (5) are mutually exclusive." *De Letelier,* 748 F.2d at 795. The legislative history of the FSIA compels the same conclusion: "Under section 1605(a)(2) [the commercial exception], no act of a foreign state, tortious or not, which is connected with the commercial activities of a foreign state would give rise to immunity if the act takes place in the United States or has a direct effect in the United States." *Texas Trading,* 647 F.2d at 311 (citing Hearings on H.R. 3493 Before Subcommittee on Claims and Governmental Relations of the House Committee on the Judiciary, 93d Cong., 1st Sess. 16 (1973)). Accordingly, I find that section 1605(a)(5)(B) does not affect this Court's subject matter jurisdiction over the interference with contract claim as established under the "commercial activity" exception to immunity.[7]

## II. Personal Jurisdiction

■ In addition to challenging the Court's subject matter jurisdiction under the FSIA, defendants also challenge the Court's exercise of personal jurisdiction over the Treuhand. They contend that, because of the Treuhand's minimal contacts with the United States, a finding of jurisdiction would violate due process. Plaintiffs, of course, disagree arguing that the Treuhand's contacts with the United States were sufficient to satisfy the constitutional constraints on personal jurisdiction. To defeat a motion challenging personal jurisdiction, plaintiffs need only make a prima facie showing of jurisdiction. *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir.1993). "The allegations in the complaint must be taken as true to the extent they are uncon-

---

7. To date, the Ninth Circuit is the only court of appeals to have held that section 1605(a)(5)(B) does not restrict the scope of the commercial activities exception established by section 1605(a)(2). *See Export Group,* 54 F.3d 1466. *But see Gregorian v. Izvestia,* 871 F.2d 1515, 1522 n. 4 (9th Cir.1989) (stating in *dictum* that Congress, in all likelihood, intended to clauses retaining immunity in section 1605(a)(5)(B) to deny jurisdiction over any claims alleging the torts listed). This Court has found only one case, *Bryks v. Canadian Broadcasting Corp.,* 906 F.Supp. 204 (S.D.N.Y.1995), that has specifically held otherwise. In *Bryks,* the court admittedly found the "literal language of Section 1605(a)(5) . . . [to] suggest that the 'commercial activity' exception and the 'tortious act' exception were designed to be mutually exclusive." *Id.* at 208. The court nonetheless found it anomalous "that

Congress would go to the trouble of specifically excluding [interference with contract] claims from the FSIA's abrogation of immunity in one part of the statute, yet would implicitly permit such claims elsewhere in the statute." *Bryks,* 906 F.Supp. at 209.

Established canons of statutory construction, however, instruct that " '[g]enerally an exception is considered a limitation only upon the matter which directly precedes it' and that 'exceptions are not to be implied.' " *Export Group,* 54 F.3d at 1473 (citing Norman J. Singer, 2A Sutherland Stat. Const. § 47.11 (5th ed.1992)). In light of the section's plain language and legislative history, I respectfully conclude that the "exception to the exception" was not intended to restrict the scope of the "commercial activity" exception to sovereign immunity.

troverted by defendant[s]' affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiffs favor." *Id.* at 580 (citing *Taylor v. Phelan,* 912 F.2d 429, 431 (10th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991)).

28 U.S.C. § 1330(b) provides that personal jurisdiction exists whenever subject matter jurisdiction exists under 28 U.S.C. § 1330(a), so as long as service has been made under 28 U.S.C. § 1608. *Texas Trading,* 647 F.2d at 312. Section 1330(a) in turn provides for subject matter jurisdiction whenever a foreign state is not entitled to immunity either under the substantive provisions of the FSIA, or under any applicable international agreement. 28 U.S.C. § 1330(a). Thus, under the FSIA "subject matter jurisdiction plus service of process equals personal jurisdiction." *Texas Trading,* 647 F.2d at 308; *Seetransport,* 989 F.2d at 580. Here, as discussed above, the Court has subject matter jurisdiction over the Treuhand. Since there is no dispute that both the Treuhand and BVS were properly served pursuant to 28 U.S.C. § 1608, the threshold statutory requirements for personal jurisdiction are satisfied.

The FSIA, however, "cannot create personal jurisdiction where the constitution forbids it." *Texas Trading,* 647 F.2d at 308; *see Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1020 (2d Cir.1991). Consequently, "[e]ach finding of personal jurisdiction under the FSIA requires, in addition [to a finding of subject matter jurisdiction and service], a due process scrutiny of the court's power to exercise its authority over a particular defendant." *Id.* The constitutional constraints on the assertion of personal jurisdiction require that there be sufficient "minimum contacts" between the foreign state and the forum "such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co., v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *Shapiro,* 930 F.2d at 1020. The "minimum contacts" test essentially involves four separate inquiries:

(1) the extent to which defendants availed themselves of the privileges of American law; (2) the extent to which litigation in the United States would be foreseeable; (3) the inconvenience to defendants in litigating in the United States; and (4) the countervailing interest of the United States in hearing the suit. *Texas Trading,* 647 F.2d at 314. Bearing in mind the permissive standard governing jurisdictional questions on a motion to dismiss, *see Seetransport,* 989 F.2d at 580, I find that the Treuhand had sufficient "minimum contacts" to satisfy due process requirements.

When determining whether "minimum contacts" exist, a distinction is made between "specific" jurisdiction and "general" jurisdiction. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.), *cert. denied, —— U.S. ——,* 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to defendant's contacts with the forum." *Id.* at 567–68 (quotations omitted). General jurisdiction, on the other hand, is based on "the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 568 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16 & nn. 8–9, 104 S.Ct. 1868, 1872–73 & nn. 8–9, 80 L.Ed.2d 404 (1984)). Because general jurisdiction is not related to the events giving rise to the suit, courts "impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's 'continuous and systematic general business contacts.'" *Id.* at 568 (citing *Helicopteros,* 466 U.S. at 416, 104 S.Ct. at 1873).

The Treuhand argues that, although from 1991 through 1993 it maintained offices in New York City and Chicago, at the time the lawsuit was filed, in February 1995, since it conducted no business activities and no longer maintained offices in the United States, its contacts are not sufficiently "continuous and systematic" for the purposes of establishing jurisdiction. While those contacts might arguably be insufficient to establish general

jurisdiction, a less stringent minimum contacts test will apply where, as here, plaintiffs' claim arises out of defendants' contacts with the United States. *See Metropolitan Life,* 84 F.3d at 567–68.

Plaintiffs' tortious interference claim is based, *inter alia,* on the transfer of ownership of newly privatized machine tool factories by the Treuhand to American competitors of WMW without advising those competitors of the Commercial Agency Contract, and the exclusive distribution agreement therein. Thus, while the Treuhand was not a party to the contract, that claim "arises out of" and is certainly "related to" the Treuhand's actions within the United States. *See Metropolitan Life Ins.,* 84 F.3d at 567.

In any event, I find that defendants' contacts with the United States were sufficiently continuous and systematic to establish general jurisdiction. Our Court of Appeals has recently held that in general jurisdiction cases, "district .courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances—up to and. including the date the suit was filed—to assess whether they satisfy the 'continuous and systematic' standard." *Metropolitan Life,* 84 F.3d at 569–70. "The determination of what period is reasonable in the context of each case should be left to the court's discretion." *Id.* As plaintiffs' claims against the Treuhand arise out of its efforts to privatize the East German machine tool industry from late 1990 through February 1995, the Court finds that time span to be the relevant period for minimum contacts inquiry. *See Metropolitan Life* 84 F.3d at 570 (period found to be reasonable for discovery period was appropriate period for court's minimum contacts inquiry).

Beginning in 1991 and continuing through 1993, the Treuhand maintained an office in New York where it employed a total of five employees. The purpose of the office was to solicit the sale of the newly privatized enterprises under its control to buyers in the United States and Canada, and from those offices, the Treuhand actually sold companies to investors in the United States. During that same time frame, the Treuhand also had an office in Chicago, Illinois. In furtherance of its commercial purposes, the Treuhand conducted at least one seminar, headed by the Treuhand's then president Detlev Rohwedder, relating to its privatization efforts and its attempts to solicit American buyers and investors. The Treuhand, to date, continues to maintain a telephone number in New York City.

By soliciting potential buyers in the United States and transferring ownership of certain machine tool factories to those purchasers, the Treuhand purposely availed itself of the privilege of conducting activities within the United States, *see Weltover,* 504 U.S. at 619, 112 S.Ct. at 2168–69, such that it would be reasonable to anticipate participation in litigation here. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980).

As to the remaining considerations concerning personal jurisdiction, I do not find unusual inconvenience to defendants in litigating in this country. Although the United States is considerably distant from Germany, the Treuhand's activities had significant international ramifications, and they directly implicate American interests insofar as the Treuhand allegedly caused direct injury to a New York based corporation. In any event, "every transnational commercial contract present problems of adjudicatory costs." *Texas Trading,* 647 F.2d at 315.

Accordingly, the Treuhand has sufficient contacts with the United States to support a constitutional exercise of personal jurisdiction.

### III. Act of State Doctrine

Defendants argue that even if the FSIA does not immunize the Treuhand, the act of state doctrine bars plaintiffs' claims against both Treuhand and WEMEX. The doctrine, which is rooted in notions of separation of powers, reflects judicial recognition that the conduct of foreign relations is properly within the province, not of the judiciary, but of the political and, particularly, the executive branches of government. *See Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897); *Allied Bank Int'l*

*v. Banco Credito Agricola de Cartago,* 757
F.2d 516, 520 (2d Cir.), *cert. denied,* 473 U.S.
934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985).

In light of those policy considerations, the
act of state doctrine "precludes the courts of
this country from inquiring into the validity
of the public acts a recognized foreign sover-
eign power committed within its own territo-
ry." *Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398, 401, 84 S.Ct. 923, 926, 11
L.Ed.2d 804 (1964); *Alfred Dunhill of Lon-
don, Inc. v. Republic of Cuba,* 425 U.S. 682,
698, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301
(1976); *Galu v. Swissair,* 873 F.2d 650, 653
(2d Cir.1989). An act by an official may
qualify as an act of state only upon a showing
"that the official had the authority to act for
and bind the state.... The burden of estab-
lishing the act and its character as an act of
state is on the party invoking the doctrine."
Restatement § 443 comment i.

Defendants have failed to demonstrate
that adjudication of plaintiffs' claims will en-
tail an inquiry into the validity of the sover-
eign acts of either the GDR or the FRG.
Defendants, in invoking the doctrine, make
no pretense that WEMEX and the Treuhand
wielded such sovereign power as "to bind"
and "act for" the state or that their actions
otherwise fall within the rubric of "public
acts of a foreign sovereign." Rather, defen-
dants contend that because plaintiffs sue for
purported losses that occurred as a result of
German reunification, adjudication of their
claims would "necessarily require this Court
to inquire into the policies and motivations of
the former GDR and the Federal Republic of
Germany and the legality of the actions of
these foreign sovereigns in abolishing the
GDR's monopoly power with respect to im-
ports and exports." Def.s' Mem. Supp.
Summ. J., at 16.

Relying primarily on *Hunt v. Mobil Oil
Corp.,* 550 F.2d 68 (2d Cir.), *cert. denied,* 434
U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977),
defendants argue that the act of state doc-

trine precludes the Court from entertaining
any such inquiries which delve into "the va-
lidity of the public acts of a recognized for-
eign sovereign power committed within its
own territory." *Sabbatino,* 376 U.S. at 401,
84 S.Ct. at 926. In *Hunt,* the plaintiffs
brought suit alleging that an illegal antitrust
conspiracy among major oil producers caused
the Libyan government to nationalize the
Hunt oil fields. Our Court of Appeals, hold-
ing that the act of state doctrine required the
dismissal of the action, noted that the plain-
tiffs "could not prevail [in their antitrust
action] without establishing a clear causal
connection between the violation alleged and
the injuries allegedly suffered ... [and
therefore] could not succeed without proving
that the defendants' conspiracy caused the
Libyan government to confiscate their prop-
erty." *Hunt,* 550 F.2d at 77; *see also Asso-
ciated Container Transportation (Australia),
Ltd. v. United States,* 705 F.2d 53, 62 (2d
Cir.1983). The Court, concluding that the
claim was "not viable unless the judicial
branch examines the motivation of the Lib-
yan action and that inevitably involves [the
action's] validity," held that the act of state
doctrine barred judicial resolution of that
claim. *Hunt,* 550 F.2d at 77. Here, in con-
trast, while the fact of German reunification
and the ensuing privatization of former East
German enterprises may have some legal
relevance in adjudicating plaintiffs' claims—
notably in determining whether reunification
was a *force majeure* or "changed circum-
stance" that rendered the contract unen-
forceable—the policy considerations that
prompted reunification and privatization, are
immaterial to plaintiffs' claims.[8]

## IV. Breach of Fiduciary Duties

Defendants next argue that Counts
II, V, and VI of plaintiffs' complaint fail to
state a claim for breach of fiduciary duties.
Count II alleges that WEMEX breached fi-
duciary duties it owed to GBC as equal own-

**8.** Additionally, judicial resolution of those claims
in favor of plaintiffs will not require the Court to
"direct[] state-owned entities to violate [their]
own national law with respect to an obligation
wholly controlled by [German] law." *Braka v.
Bancomer, S.N.C.,* 762 F.2d 222, 225 (2d Cir.
1985). The remedies available to plaintiffs, if

ultimately successful in this action, would be the
award of damages and would not require the
Treuhand or WEMEX to violate any laws abolish-
ing the GDR's monopoly over the exports or
mandating the privatization of the machine tool
industry.

er of WMW; Count V alleges that WEMEX breached fiduciary duties it owed to WMW as WMW's co-owner; and Count VI alleges that Muender breached fiduciary duties that he owed to WMW in his capacity as liquidator of WEMEX's assets. These claims arise out of alleged duties created under the Joint Venture Agreement executed by WEMEX and GBC. Because plaintiffs have failed to identify any legally cognizable fiduciary duties owed by WEMEX to either GBC or WMW, defendants' motion to dismiss Counts II, V, and VI is granted.

Plaintiffs contend that, under the Joint Venture Agreement, WEMEX and GBC became joint venturers in WMW, and that WEMEX, having failed to further the interests of WMW, violated fiduciary duties that it owed to GBC arising from their relationship as joint venturers. Additionally, plaintiffs assert that pursuant to the Joint Venture Agreement, WEMEX became an "equal co-owner" of WMW. Thus, plaintiffs continue, WEMEX, as a shareholder of a "closely held corporation," owed WMW a duty of "undivided and unqualified loyalty," which it breached, in part, by failing to require newly privatized East German manufacturers to honor WMW's exclusive distribution rights.

Since, under New York law, a joint venture may not be carried on through a corporate form, any fiduciary obligations that coventurers might owe one other cease to exist once the joint venturers agree to conduct business as a corporation. See *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 541 N.Y.S.2d 746, 747, 539 N.E.2d 574 (Ct.App.1989); *Sanders v. Boelke*, 172 A.D.2d 1014, 569 N.Y.S.2d 272, 274 (4th Dep't 1991). Here, the purpose of the Joint Venture Agreement was to allow its signatories to facilitate the operation of an exclusive distribution agent, WMW, for the sale and service in the United States of machine tools manufactured in East Germany. That objective was to be achieved through the establishment of WEMEX and GBC's equal co-ownership in Alurop, a Pana-

manian corporation, which, in turn, was the 100% owner of WMW. Once their ownership in Alurop was established, the venturers, WEMEX and GBC, had only the rights of stockholders of Alurop. See *Sanders*, 569 N.Y.S.2d at 274; *Bevilacque v. Ford Motor Co.*, 125 A.D.2d 516, 509 N.Y.S.2d 595, 599 (2d Dep't 1986); *Rosiny v. Schmidt*, 185 A.D.2d 727, 587 N.Y.S.2d 929, 932 (1st Dep't 1992); *see also Weisman v. Awnair Corp.*, 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) ("A joint venture may not be carried on by individuals through a corporate form. The two forms of business are mutually exclusive, each governed by a separate body of law.").

In addition, plaintiffs' allegation that WEMEX's fiduciary obligations to WMW arose from WEMEX's co-ownership in WMW, a closely held corporation,[9] mischaracterizes WEMEX's legal relationship to WMW as established under the Joint Venture Agreement. The shareholder of a closely held corporation is indeed subject to a standard of honest and good faith which requires the shareholder to devote its "undivided and unqualified loyalty to the corporation," *Fender v. Prescott*, 101 A.D.2d 418, 476 N.Y.S.2d 128, 132 (1st Dep't 1984). WEMEX, however, was not a shareholder in WMW but rather a 50% shareholder in WMW's parent company, Alurop. Alurop, in turn, owned 100% of WMW's stock. Thus, Alurop, and not WEMEX, owed WMW a duty of care.

No other cognizable grounds for their breach of fiduciary duties claims having been advanced, counts II, V, and VI of plaintiffs' complaint are dismissed.

## V. Forum Selection Clause

■ Defendants further contend that the claim against WEMEX and Muender for wrongful conversion of the Heckert machine tools is governed by a forum selection clause that precludes this Court from resolving that claim.[10] The Heckert Agreement provides

---

**9.** A closely held corporation is one "the shares of which are not traded on a national securities exchange or regularly quoted on an over the counter market by one or more members of a national or an affiliated securities association." *Fehr Bros., Inc. v. Scheinman*, 121 A.D.2d 13,

509 N.Y.S.2d 304, 310 n. 1 (1st Dep't 1986); *see* New York Business Corporation Law § 630(a).

**10.** Defendants also contend that the breach of fiduciary duties claim against Muender should be dismissed on similar grounds. Having already

that (1) the rights of the parties are to be governed by the law of the FRG, and (2) any dispute arising out of or in connection with the Agreement "shall be finally and effectively decided by the appropriate regular court located at the principal place of business of the Defendant." Heckert Agreement Art. 23. Defendants contend that because the wrongful conversion claim "relates to goods and alleged obligations which were the subject of the [Heckert Agreement]," (Defs.' Memo. in Support of Mot. for Summary Judgment at 22), that claim "arise[s] out of or in connection" with the Agreement and must, therefore, be resolved by an appropriate German court.

In assessing the enforceability of a forum selection clause, the Court must first determine whether, under the terms of the Heckert Agreement, the clause applies. If it does, the clause should be enforced unless it is clearly shown that enforcement would be unreasonable or unjust or that the clause was obtained through fraud or overreaching. *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990).

Plaintiffs argue that tort claims, including those for wrongful conversion fall beyond the scope of the clause. Yet, the clause's unequivocal terms make clear that the applicability of the forum selection clause turns, not on the type or nature of the cause of action, but on whether the claim in question "arises out of or in connection" with the Heckert Agreement. *See, e.g., Roby v. Corporation of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993); *Anselmo v. Univision Station Group, Inc.*, 1993 WL 17173 at *2 (S.D.N.Y. Jan.15, 1993) (J., Carter) (finding tort claim alleging interference with 1987 resolution to indemnify the plaintiff "related to" a 1986 Agreement but that tort claim alleging interference with 1985 resolution to indemnify did not "relate to" the Agreement because the tort grew out of events which preceded the Agreement).

Contrary to plaintiffs' contentions, I find that the allegations that WEMEX and Muen-der wrongfully converted property belonging to WMW are connected to the underlying Agreement. During the second half of 1991, WMW ordered Heckert machine tools from WEMEX pursuant to the Heckert Agreement. At the time, payment in arrears from WMW to WEMEX amounted to $10,181,-914.01. When Muender discovered in the fall of 1993 that a large number of Heckert machine tools involved in the purchase were still in Germany but had not been paid for, Muender obtained a court order from a district court in Germany for attachment, pursuant to which the machines were seized and their shipment to the United States prevented. Muender Decl. ¶ 23. Defendants assert that the legal basis for the attachment was that the agreed upon purchase conditions set forth in the Heckert Agreement provided that all machines remained the property of WEMEX until fully paid. Plaintiffs, in turn, contend that "consistent with the Heckert Agreement" and with the practice of the parties, title to the machine tools were transferred to WMW earlier, upon delivery of the goods to Heckert's warehouse for storage. The dispute over the parties' ownership rights to the attached Heckert machine tools is clearly "in connection" with the Heckert Agreement.

Forum selection clauses, like the one at issue here, are "presumptively valid where the underlying transaction is fundamentally international in character." *Roby*, 996 F.2d at 1361 (citing *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)). Plaintiffs may, nonetheless, overcome that presumption of validity upon a clear showing that enforcement would be unreasonable under the circumstances. *The Bremen*, 407 U.S. at 10, 92 S.Ct. at 1913; *Roby*, 996 F.2d at 1363. The Supreme Court has construed this exception narrowly:

forum selection and choice of law clauses are "unreasonable" (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party "will for all practical purposes be

determined that Muender, as liquidator of WE-MEX, owed no fiduciary duty to WMW, the Court does not reach the issue of whether that claim is

governed by the Heckert Agreement's forum selection clause.

deprived of his day in court," due to the grave inconvenience of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state.

*Roby,* 996 F.2d at 1363 (internal citations omitted) (citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 1528, 113 L.Ed.2d 622 (1991); *The Bremen,* 407 U.S. at 12–13, 15, 92 S.Ct. at 1914–15, 1916).

Here, plaintiffs have adduced no evidence, nor do they even advance the argument, that the forum selection clause is "unreasonable" for any one of these reasons. Plaintiffs do not demonstrate that they were fraudulently induced into agreeing to it or that litigation in Germany would cause substantial inconvenience to WMW. Nor do they claim that proceeding in a German court would deprive WMW of a remedy. Since WMW and the Treuhand entered into the Heckert Agreement with full knowledge of the Treuhand's relationship to the German government, any inconvenience suffered by being forced to litigate in the contractual forum was clearly foreseeable. Consequently, I find that the forum selection clause governs plaintiff's wrongful conversion claim against Muender and that that claim should, therefore, be litigated in Germany.[11]

11. The Court further rejects plaintiffs' somewhat novel contention that the Treuhand, having violated the forum selection clause itself, has waived its right to invoke the clause. In November 1993, Muender commenced an action in Germany for sums allegedly due from WMW under the Heckert Agreement. Assuming the forum selection clause applies to that claim, it should have been brought in New York, WMW's principal place of business.

Generally, if a party intentionally relinquishes a known right, either expressly or by conduct inconsistent with an intent to enforce that right, it has waived it and may not thereafter seek judicial enforcement. *Beacon Terminal Corp. v. Chemprene, Inc.,* 75 A.D.2d 350, 429 N.Y.S.2d 715, 718 (2d Dep't 1980) The intention to waive must be clearly established and cannot be inferred from doubtful or equivocal acts or language, and the burden of proof is on the party asserting the waiver. *East 56th Plaza, Inc. v. Abrams,* 91 A.D.2d 1129, 458 N.Y.S.2d 953, 955 (3d Dep't 1983).

## VI. The German Law Defense of "Changed Circumstances"

■ Defendants' next ground for summary judgment is that all claims arising out of the Commercial Agency Contract and the Joint Venture Agreement are barred by the German defense of "changed circumstances."

The "changed circumstance" defense, though an element of the former GDR's "Law for Commercial Contract," still applies to certain preunification contracts, including the Commercial Agency Contract.[12] The Reunification Agreement between the FRG and GDR provided that all legal relationships existing prior to reunification would continue to be subject to GDR law. Because the Commercial Agency Contract between WEMEX and WMW provided that the law of the (now former) GDR applied to the contractual relationship, the GDR "Law for Commercial Contract," continues to apply to the Commercial Agency Contract. Section 295 of the "Law for Commercial Contract," sets forth the "changed circumstances" defense:

(1) If, for the performance of the purpose of the contract, essential circumstances upon which both parties entered into the contract but over which they have no control, have changed so fundamentally and if they, had they known of such circumstances at the time of contracting, would not have concluded the contract, the party disadvantaged by the occurrence of such

Here, it is far from clear that defendants intended to waive their right to enforce the forum selection clause. The only evidence of intent adduced by plaintiffs is Muender's act of filing the suit in Germany. It is possible that Muender selected that forum out of "negligence, oversight, or thoughtlessness," in which case defendants cannot be said to have intentionally relinquished any established rights. *Beacon,* 429 N.Y.S.2d at 718.

12. Although defendants claim that the "changed circumstances" defense also applies to the Joint Venture Agreement, the choice of law clause therein clearly states that the Agreement will be "governed by and in accordance with the laws of the State of New York." Joint Venture Agreement ¶ 10. Accordingly, the defense, if it has any application in this action, is relevant only to those claims relating to the Commercial Agency Contract.

circumstances is entitled to propose to the other party an appropriate modification of the contract.

(2) If the other party does not agree to this request or the contract purpose cannot be achieved with a modification, the disadvantaged party is entitled to terminate the contract without notice and the other party is entitled to demand reimbursement of expenses for nonperformance.

The parties, as a preliminary matter, disagree over whether German reunification qualifies as a "changed circumstance" under the terms of the statutory defense. Defendants contend that the GDR's preunification monopoly over export trade was an "essential circumstance" which, since reunification, has "changed so fundamentally" that if no monopoly had existed at the time of contracting, WEMEX would not have concluded the Commercial Agency Contract.

Plaintiffs, in turn, argue that the political events unfolding in Germany did not alter WEMEX's obligations under the Joint Venture Agreement and the Commercial Agency Contract, and thus, that the "changed circumstances" defense does not apply. As evidence of WEMEX's continued ability to fulfill its contractual obligations, plaintiffs contend that the Treuhand induced WMW to continue its marketing efforts in the United States, and even went so far as to ensure WMW that the Contract was still valid and that the Treuhand could take steps to require the manufacturers to honor WMW's exclusive distribution rights as established under the Commercial Agency Contract.[13]

Additional controversy exists as to whether, assuming that the "changed circumstances" defense applies, the contract purpose could have been achieved with a modification. Only if the agreement could not be modified could it be terminated. According to defendants, the end of the government monopoly was such that modification of the Commercial Agency Contract was impossible under section 295(2) because

WEMEX, after privatization of the East German machine tool industry, could no longer guarantee deliveries to WMW. After reunification, former state instituted plans regulating the export and import of machine tools had ceased to bind either WEMEX or the former GDR machine tool manufacturers. Manufacturers were thereafter free to enter into and fulfill export contracts on their own without the involvement of an AHB like WEMEX. Plaintiffs disagree, contending that even if the defense does apply to the Commercial Agency Contract, modifications to the Contract's terms could reasonably have been made.

As the Court's determination of whether the "changed circumstances" defense applies to the Commercial Agency Contract related claims necessarily involves resolution of disputed issues of material facts, defendants' motion for summary judgment on that ground is denied.

## VII. Forum Non Conveniens

Defendants finally contend that the Complaint, in its entirety, must be dismissed on *forum non conveniens* grounds. Application of the *forum non conveniens* doctrine involves a two prong inquiry. The first is whether there is an alternative forum that has jurisdiction. *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). The court must next assess which of the two fora will be most convenient and will best serve the interests of justice. *Id.* In making that second determination, the court weighs a variety of private and public interest considerations as set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *Peregrine Myanmar,* 89 F.3d at 46; *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir.1996). "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. at 843.

The private factors include the relative ease of access to sources of proof; the cost of

---

**13.** Defendants, in stark contrast, assert that WEMEX terminated the Commercial Agency Contract by letter dated September 12, 1991, citing the abolition of the GDR export monopoly and other changes since reunification as reasons for the termination. WMW claims never to have received that letter.

obtaining attendance of willing witnesses; the availability of compulsory process for attendance of the unwilling; the enforceability of judgments, and all other practical problems that make trial easy, expeditious, and inexpensive. *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843; *Peregrine Myanmar,* 89 F.3d at 46–47; *Scottish Air,* 81 F.3d at 1232.

The public factors include administrative difficulties stemming from court congestion; the undesirability of imposing jury duty on a community which has no relation to the litigation; the local interest in having localized controversies decided at home; and the appropriateness of holding the trial in a forum that is at home with the applicable law, 'rather than having a court . . . untangle problems in conflict of laws, and in law foreign to itself.' *Scottish Air,* 81 F.3d at 1232 (quoting *Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843).

As for the first prong, defendants claim that Germany is a superior forum to New York, and plaintiffs do not dispute that German courts would have jurisdiction over the parties. Moving to the second prong—the relative convenience and the interest of justice—the Court "starts with a presumption in favor of the plaintiff[s]' choice of forum." *Peregrine Myanmar,* 89 F.3d at 46.

Arguing that the first two "private" factors—access to sources of proof and the cost of obtaining attendance of willing witnesses—weigh in their respective favors, the parties both claim the greater number of witnesses who reside in their preferred forum. Plaintiff adds that most of the documents and records produced by the parties to date have come from plaintiffs' New York office. The parties' dualing of witnesses, however, merely serves to balance the opposing positions of the parties. Wherever the trial takes place, the witnesses will be required to travel some considerable distance.

Turning to the enforceability of judgments, in light of the defendants' ties to Germany—one of the defendants is a German corporation, the second is a German governmental agency, and the third is a German resident—it would appear that a German judgment against defendants would be more meaningful than a New York judgment. *See Peregrine Myanmar,* 89 F.3d at 47.

As to the remaining two private interest factors—the availability of compulsory process for attendance of unwilling witnesses and practical problems that make trial more convenient or inexpensive—neither party has claimed that the testimony of any critical witness will be unavailable. Nor do they identify any practical problems, beyond transnational travel, that would arise if the action proceeded in either Germany or New York. Having considered the balance of the private interest factors, I find that they tilt only slightly in favor of Germany as an alternative forum to New York.

The public interest factors do not tilt any more definitively toward Germany as the appropriate forum. First, there are no undue administrative difficulties stemming from court congestion in this forum. *Peregrine Myanmar,* 89 F.3d at 47. Second, although Germany has a "local interest in having localized controversies decided at home," *id.,* New York has a countervailing strong interest in this litigation insofar as both GBC's and WMW's principal places of business are here in New York, and both were injured by defendants' alleged wrongdoing. "This [also] means that the third factor, imposing jury duty upon the people of a community which has no relation to the litigation' [ ] is not implicated." *Id.* (citing *Scottish Air,* 81 F.3d at 1232).

The fourth factor—the appropriateness of holding the trial in a forum that is at home with the applicable law—weighs equally on both sides of the balance. The Joint Venture Agreement provides it is "to be governed by and in accordance with the laws of the State of New York." Meanwhile, the law of the GDR is applicable to the Commercial Agency Contract, which is also the subject of this lawsuit. Thus, the courts of either forum would be required to apply foreign law. Applying the *Gilbert* factors in light of the principle that the plaintiffs' choice of forum should not be lightly disturbed—particularly where they have chosen their home forum, *see Scottish Air,* 81 F.3d at 1232—defendants' motion to dismiss on *forum non conveniens* grounds is denied.

## CONCLUSION

For the foregoing reasons, the claims against Muender and WEMEX for breach of

fiduciary duties (Counts II, V, and VI) are dismissed because they fail to identify any legally cognizable fiduciary duties owed by those defendants to plaintiffs. Defendants' motion for summary judgment, pursuant to Fed.R.Civ.P. 56, with respect plaintiffs' conversion claim (Count VII) is granted as it is subject to an exclusive forum selection clause which relegates its resolution to the German courts. Defendants' motion for summary judgment with regard to all other counts is denied.

SO ORDERED.