**ESI, INC., Plaintiff,**

v.

**COASTAL POWER PRODUCTION COMPANY a/k/a Coastal Power Company, La Casa Castro, S.A. de C.V. and Latin American Energy Development, Inc. d/b/a Desarrollos Energeticos Latino Americanos, S.A., Defendants.**

No. 96 CIV. 7381(WCC).

United States District Court, S.D. New York.

March 2, 1998.

Aydelott & Aydelott, Mount Kisco, NY (Christopher P. Keenan, of Counsel), for Plaintiff.

Colson, Hicks, Edison, Colson, Matthews, Martinez & Mendoza, P.A., Miami, FL (Roberto Martinez, of Counsel), Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, New York, NY (Jeffrey B. Sklaroff, of Counsel), for Defendant Coastal Power Company.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This diversity action arises from a dispute as to the parties' relative ownership interests in an electrical generating power plant located in El Salvador. Presently before the Court is a motion to dismiss brought by defendant Coastal Power Production Company a/k/a Coastal Power Company ("Coastal"). Coastal seeks dismissal of the Amended Complaint (1) pursuant to Fed.R.Civ.P. 12(b)(3) on the ground of improper venue, (2) on the ground of *forum non conveniens*, and (3) pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. For the reasons discussed below, Coastal's motion to dismiss is granted in part and denied in part.

## BACKGROUND

Unless otherwise indicated, the following factual account is based on the allegations in plaintiff's Amended Complaint, including documents appended to, and documents incorporated by reference by, the Amended Complaint. *See* Fed.R.Civ.P. 10(c); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2nd Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2nd Cir.1991). To the extent that this factual background refers

to the supplementary affidavit and declarations submitted by the parties, such information will be considered only for purposes of deciding the venue and *forum non conveniens* issues. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (deciding *forum non conveniens* motion on the basis of affidavits); *Cuizon v. Kedma, Ltd.*, No. 96 Civ. 0229, 1997 WL 37938 (S.D.N.Y. Jan.30, 1997) (deciding Rule 12(b)(3) motion to dismiss for improper venue on the basis of affidavits). Any references in the factual background to these supplemental materials will be disregarded for purposes of deciding whether the Amended Complaint states a cognizable claim.[1] *See Cortec*, 949 F.2d at 47 (in deciding Rule 12(b)(6) motion to dismiss, court may not consider any documents outside the pleadings).

In 1993, the government of El Salvador, through its nationally-owned utility, Comision Ejecutiva Hidroelectrica del Rio Lempa ("CEL"), solicited bids from developers for the construction, ownership, and operation of an electrical generating power plant to be built in Nejapa, El Salvador (the "Project"). The winning bidder would receive the exclusive right, for a fixed period, to negotiate and execute with CEL a "Power Purchase Agreement," which would establish the terms and conditions under which the bidder would agree to construct and operate the power plant and CEL would agree to purchase electricity from that facility.

Several developers organized to secure the right to develop the power plant. Defendant Latin American Energy Development, Inc. d/b/a Desarrollos Energeticos Latino Americanos, S.A. ("DELASA"),[2] contacted Independent Energy Corporation ("IEC")[3] to participate in submitting a bid proposal to CEL. In turn, IEC invited United Thermal Development Corporation ("UTDC")[4] to be a

---

1. When, on a Rule 12(b)(6) motion to dismiss, matters outside the pleadings are included in the motion papers, the Court may either treat the motion as one for summary judgment or exclude the additional material and decide the motion on the complaint alone. *See Kopec v. Coughlin*, 922 F.2d 152, 154 (2nd Cir.1991). At this early stage of the proceedings, and with Rule 12(b)(6) issues constituting only a portion of the instant motion, there is no sound reason to convert the motion into a motion for summary judgment.

2. DELASA is a Louisiana corporation with its principal place of business in Louisiana.

3. IEC is a Connecticut corporation with its principal place of business in Connecticut.

4. UTDC was a wholly-owned subsidiary of United Thermal Corporation ("UTC"), a Delaware corporation with its principal place of business in New York.

joint venturer in submitting a bid proposal to CEL and developing the power plant. Defendant La Casa Castro, S.A. de C.V. ("La Casa Castro"), an El Salvador corporation, acted as the host company and in-country liaison for the developers.

In January 1994, IEC and UTDC submitted a joint bid on behalf of themselves, DELASA, and La Casa Castro. CEL accepted the bid the following month, granting IEC and UTDC the exclusive right, for a limited time, to enter a Power Purchase Agreement.[5] Around this time, UTC (including its subsidiary, UTDC) was acquired by Trigen Energy Corporation ("Trigen").[6] Trigen was substituted for UTDC on the bid and took its place as a Project developer.

At the end of April 1994, Trigen, DELASA and La Casa Castro entered a written agreement establishing their respective rights and obligations as joint venturers (the "Three–Party Agreement"). The Three–Party Agreement, which was negotiated and executed in New York, (Affidavit of Robert McVay, dated Mar. 19, 1997, ¶¶ 8–12), did not include IEC. The Three–Party Agreement established the proportionate ownership interests in the Project: Trigen, 75%; La Casa Castro, 15%; DELASA, 10%.

The Three–Party Agreement also stipulated that Trigen alone would enter into the Power Purchase Agreement with CEL. Because the bid had been awarded jointly to IEC and UTC (Trigen's predecessor), Trigen requested, and obtained, an assignment of IEC's interest in the Project.

Prior to this assignment, Robert McVay was a Vice President of IEC and served as Director of the Project. In January 1994, McVay left IEC and formed ESI, Inc. ("ESI"), the plaintiff in this action.[7] As head of ESI, McVay continued to serve as Project Director; as compensation for his services, in May 1994 DELASA assigned one-quarter of its 10% interest in the Project to ESI (the "DELASA–ESI Assignment"). The DELASA–ESI Assignment specifically referred to the Three–Party Agreement as the source of DELASA's interest in the Project. As required by Section 14 of the Three–Party Agreement, the DELASA–ESI Assignment received the written consent of both Trigen and La Casa Castro. Trigen signed the DELASA–ESI Assignment in its New York office. (McVay Aff. ¶ 14.)

Before Trigen executed the Power Purchase Agreement, Trigen and Tenneco Gas International, Inc. ("Tenneco") agreed that Trigen would assign its entire interest in the Project to Tenneco after the Power Purchase Agreement had been executed. However, Tenneco would not accept the assignment from Trigen, and Trigen would not execute the Power Purchase Agreement, unless DELASA and La Casa Castro first released Trigen from any and all obligations under the Three–Party Agreement. On May 17, 1994, after several extensions of the deadline for the execution of the Power Purchase Agreement had passed, and as the deadline for forfeiting the $2 million bond approached, DELASA and La Casa Castro executed a Release Agreement. The Release Agreement made no mention of ESI or of the DELASA–ESI Assignment.

After obtaining the release, Trigen executed the Power Purchase Agreement with CEL and simultaneously assigned its interest in the Project to Tenneco (the "Trigen–Tenneco Assignment"). The Trigen–Tenneco Assignment was executed in Trigen's New York office. (McVay Aff. ¶ 36.) Thereafter, Tenneco sold its interest in the Project to defendant Coastal, which guided the Project to completion.[8]

ESI commenced this action on September 27, 1996, seeking a declaration as to the validity and enforceability of its 2.5% ownership interest in the power plant. The original complaint asserted only one cause of action (for a declaratory judgment) and named only Coastal as a defendant. On July 22, 1997, ESI filed an Amended Complaint

---

5. CEL required the developers to post a $2 million bond (which La Casa Castro furnished), which would be forfeited if a Power Purchase Agreement were not executed by the deadline.

6. Trigen is a New York corporation with its principal place of business in New York.

7. ESI is a Connecticut corporation with its principal place of business in Connecticut.

8. Coastal is a Texas corporation with its principal place of business in Texas.

adding DELASA and La Casa Castro as defendants and setting forth several new claims.[9] Unless otherwise stated, all claims in the Amended Complaint are against all three defendants.

The First Claim in the Amended Complaint seeks a declaratory judgment that, pursuant to the Three–Party Agreement and the DELASA–ESI Assignment, ESI has a valid and enforceable ownership interest in 2.5% of the Project and the power plant's income. The Second Claim, against Coastal and La Casa Castro, alleges damages related to ESI's status as an intended third-party beneficiary of the Power Purchase Agreement. The Third Claim seeks damages for breach of the Three–Party Agreement. The Fourth Claim, against Coastal only, alleges tortious interference with the Three–Party Agreement. The Fifth and Seventh Claims, respectively, allege conversion of ESI's interest in the Project and conspiracy to commit conversion. The Sixth and Eighth Claims, respectively, allege breach of fiduciary duty and conspiracy to commit such breach. The Ninth Claim, against DELASA only, seeks damages for breach of the DELASA–ESI Assignment. The Tenth and Eleventh Claims, against Coastal and La Casa Castro, allege, respectively, tortious interference and conspiracy to interfere with the DELASA–ESI Assignment. The Twelfth Claim seeks an accounting and the imposition of a constructive trust. The Thirteenth Claim alleges unjust enrichment. Finally, the Fourteenth Claim seeks damages for prima facie tort.

Coastal now moves to dismiss the Amended Complaint on three grounds. First, it contends that under 28 U.S.C. § 1391(a)(2), the Southern District of New York is an improper venue for this action. Second, even if venue is statutorily proper, Coastal asserts that the case should be dismissed based on the doctrine of *forum non conveniens*. Lastly, pursuant to Fed.R.Civ.P. 12(b)(6), Coastal

seeks dismissal of each claim against it, with the exception of the Third Claim, for failure to state a claim upon which relief may be granted.

## DISCUSSION

### I. *Venue*

When venue is challenged, the plaintiff bears the burden of proving that venue is proper in the chosen forum. *Central Sports Army Club v. Arena Assocs., Inc.*, 952 F.Supp. 181, 188 (S.D.N.Y.1997). Here, ESI asserts (1) that this venue is proper based on the forum-selection clause in the Three–Party Agreement, to which it contends Coastal is a successor, and (2) that, in any event, venue is proper under 28 U.S.C. § 1391(a). The Court need not decide at this point whether Coastal is a successor to the Three–Party Agreement and its forum-selection clause because, in any event, the Southern District of New York is a proper forum under § 1391(a).

■ In order to establish venue in the instant case, ESI must demonstrate that a substantial part of the events giving rise to its claim occurred in the Southern District of New York. *See* 28 U.S.C. § 1391(a)(2).[10] The fact that substantial activities may have taken place in other districts is not dispositive; venue may lie in more than one district. *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F.Supp. 731, 735–36 (S.D.N.Y.1996) (Conner, J.). In the case of multiple claims, proper venue must be established with respect to each cause of action asserted. *Id.* at 736 (citing *PI, Inc. v. Quality Prods., Inc.*, 907 F.Supp. 752, 757 (S.D.N.Y.1995)).

■ Where, as here, a contract forms the basis of plaintiff's claims, "courts consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." *Id.* (quoting *PI, Inc.*, 907

---

9. La Casa Castro has not yet been served.

10. Section 1391(a) provides: "A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in

which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought." 28 U.S.C. § 1391(a) (West Supp. 1997).

F.Supp. at 757–58). Venue may be proper in the district where the contract was substantially negotiated, drafted, and/or executed, even if the contract was not to be performed in that district and the alleged breach occurred elsewhere. *Id.* Indeed, § 1391(a)(2) "may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action." *Constitution Reins. Corp. v. Stonewall Ins. Co.,* 872 F.Supp. 1247, 1249 (S.D.N.Y.1995) (quoting *Sacody Technologies, Inc. v. Avant, Inc.,* 862 F.Supp. 1152, 1157 (S.D.N.Y.1994)).

■ Here, the three agreements forming the basis of ESI's claimed interest in the Project were substantially negotiated, drafted, and/or executed in this district. To begin with, the Power Purchase Agreement, which created ownership interest in the Project, was drafted in New York by Trigen's attorneys. (McVay Aff. ¶¶ 25, 27 .) Although the Power Purchase Agreement was executed and partially negotiated in El Salvador, (Declaration of Roberto Vilanova, dated Dec. 18, 1996, ¶ 5), some negotiations among the developers took place in New York, and much of the negotiations between the developers and CEL involved communications between New York and El Salvador, (McVay Aff. ¶¶ 25–28). Moreover, negotiations between Trigen and Tenneco pertaining to the Power Purchase Agreement and Trigen's assignment to Tenneco of its interests under that agreement were conducted through correspondence between their respective New York and Texas offices, and Trigen executed the Trigen–Tenneco Assignment in its New York office. (*Id.* ¶¶ 29, 32–33, 36.)

In addition, the Three–Party Agreement (and a proposed predecessor agreement), which established the developers' proportionate interests in the Project, was substantially negotiated in New York. (*Id.* ¶¶ 11–12.) Trigen executed the Three–Party Agreement in its New York office. (*Id.* ¶ 12.)

Finally, negotiation and execution of the DELASA–ESI Assignment, from which ESI's claimed interest in the Project most immediately derives, also occurred substantially in New York. Negotiations for the DELASA–ESI Assignment were initiated at the same New York meetings from which the Three–Party Agreement ultimately arose. (*Id.* ¶ 12.) Moreover, negotiations to obtain Trigen's consent to the DELASA–ESI Assignment occurred in telephone conversations between ESI and Trigen's New York office; Trigen sent a written memorandum from New York to Tenneco in Texas advising Tenneco of the proposed assignment between DELASA and ESI; and Trigen ultimately signed the DELASA–ESI Assignment in its New York office. (*Id.* ¶¶ 13–14.)

The Court finds that venue is proper in the Southern District of New York as to all claims which survive the present motion, and therefore denies Coastal's motion to dismiss for improper venue.

## II. *Forum Non Conveniens*

■ Even when jurisdiction exists and venue is proper, the doctrine of *forum non conveniens* permits a court to dismiss an action if trial elsewhere would "best serve the convenience of the parties and the ends of justice." *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2nd Cir.1996) (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)); *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (plaintiff's choice of forum may be disturbed "when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience' ") (quoting *Koster,* 330 U.S. at 524). In applying the doctrine, the court starts with a strong presumption in favor of the plaintiff's choice of forum. *Piper,* 454 U.S. at 255; *Murray,* 81 F.3d at 290. To overcome this presumption, a defendant must demonstrate (1) that an adequate alternative forum exists, and (2) that, considering relevant private and public interest factors, the balance of convenience tilts strongly in favor of trial in the alternative forum. *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2nd Cir.1991). Ultimately, the "decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court ...." *Scottish Air Int'l, Inc. v.*

*British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2nd Cir.1996).

### A. *Existence of Adequate Alternative Forum*

An alternative forum ordinarily will be adequate if the defendant is subject to the jurisdiction of that forum. *Maganlal,* 942 F.2d at 167 (citing *Piper,* 454 U.S. at 254 n. 22). Where the alternative forum is foreign, "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render [the foreign forum] inadequate." *Borden, Inc. v. Meiji Milk Prods. Co.,* 919 F.2d 822, 829 (2nd Cir.1990) (citation omitted); *see also Piper,* 454 U.S. at 249–55.

Based on the declaration of Dr. Saul Litvinoff submitted by Coastal, the laws of El Salvador provide substantive and procedural protections adequate to resolve the ownership issues in this case. (*See* Declaration of Dr. Saul Litvinoff, dated Dec. 18, 1996.) In addition, defendants Coastal and La Casa Castro appear to be amenable to process in El Salvador—Coastal by consent, (*see* Declaration of James Gray, dated December 19, 1996, ¶ 18), and La Casa Castro by virtue of its status as an El Salvador corporation.

However, the requirement that a defendant be subject to the jurisdiction of the alternative forum "refers to all defendants." *Madanes v. Madanes,* 981 F.Supp. 241, 265–66 (S.D.N.Y.1997). Neither party has addressed whether DELASA would be subject to jurisdiction in El Salvador, nor has DE-LASA indicated whether it would consent to jurisdiction there. In any event, even if DE-LASA were subject to jurisdiction in El Salvador (by consent or otherwise), and even if El Salvador is an adequate alternative forum, dismissal would nevertheless be unwarranted because, as discussed below, the balance of private and public factors does not strongly favor the El Salvadoran forum. *Cf. id.* at 266 ("[T]he Court concludes that it would be improper to dismiss the case absent a proffer by all of the Defendants that they would be willing to consent to the jurisdiction of the [foreign] court .... No such proffer has been made. Nor, we note, would one alter this Court's conclusion that dismissal is unwarranted because ... the [factors set out in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)] do not strongly favor the [foreign] forum.").

### B. *Factors*

In determining whether venue would be more appropriate in an available and adequate alternative forum, the Court must weigh a variety of private and public considerations, as set out in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) (the "*Gilbert* factors"). *See Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2nd Cir.1996). Relevant private interests include (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the possibility of view of premises, if view would be appropriate to the action; (5) the enforceability of a judgment; and (6) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *See Gilbert,* 330 U.S. at 508; *Maganlal,* 942 F.2d at 168. Relevant public factors include (7) the administrative difficulties flowing from court congestion; (8) local interest in having localized controversies decided at home; (9) the unfairness of burdening citizens in an unrelated forum with jury duty; and (10) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action, and the avoidance of unnecessary problems in conflict of laws or in the application of foreign law. *See Gilbert,* 330 U.S. at 509; *Maganlal,* 942 F.2d at 168. The strong presumption in favor of plaintiff's choice of forum is not overcome unless the balance of these private and public factors weighs heavily in favor of trial in the alternative forum. *Id.* at 167–68.

### 1. *The relative ease of access to sources of proof.*

Coastal asserts that most of the documents relevant to this action are located in El Salvador and are in Spanish. (*See* Coastal's Mem. of Law in Support of its Motion to Dismiss the Am. Compl., dated Sept. 29, 1997, at 13.) While it may be true that many documents relating to the development, construction, and operation of the Nejapa power

plant are located in El Salvador and are in Spanish, (*see* Gray Decl. ¶ 13; Vilanova Decl. ¶ 10), the documents most relevant to ESI's claims—the Power Purchase Agreement, the Three–Party Agreement, the DELASA–ESI Assignment, and the Trigen–Tenneco Assignment—are either located in the United States or, as evidenced by attachments to the parties' motion papers, can be easily obtained. Moreover, these documents either were executed in English or have already been translated into English.

In addition, Coastal has not substantiated its contention that "a large percentage of the witnesses are located in El Salvador." (Coastal's Mem. in Support, at 13.) Some witnesses, particularly employees of La Casa Castro, are located in El Salvador. However, it appears that most of the witnesses with knowledge of the negotiation and execution of these documents are located in the United States, whether at ESI's Connecticut offices, Coastal's Texas offices, DELASA's Louisiana offices, Trigen's New York offices, or elsewhere in this country. Whether this case proceeds in New York or El Salvador, witnesses would be required to travel internationally. *Cf. Peregrine,* 89 F.3d at 46–47 ("Though [defendant] makes much of the fact that a New York forum entails transoceanic travel for some people, the district court pointed out that '[w]herever the trial takes place, witnesses will be forced to travel to provide testimony.'"); *WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau,* 960 F.Supp. 734, 750 (S.D.N.Y. 1997) ("The parties' dualing of witnesses ... merely serves to balance the opposing positions of the parties. Wherever the trial takes place, the witnesses will be required to travel some considerable distance.") As between New York and El Salvador, locating this action in the former forum would appear to impose less of a travel burden on witnesses.

2. *Availability of compulsory process for attendance of unwilling witnesses.*

As neither party has claimed that the testimony of any critical witness will be unavailable in either forum, this factor does not weigh in favor of dismissal. *See Peregrine,* 89 F.3d at 47; *WMW Machinery,* 960 F.Supp. at 750.

3. *Cost of obtaining attendance of willing witnesses.*

There appear to be at least as many potential witnesses residing in the United States as in El Salvador, and it would be just as costly to fly United States witnesses to El Salvador as it would be to fly El Salvador witnesses to the United States.

4. *Possibility of view of the premises.*

There would be no need to view the Nejapa power plant in order to adjudicate ESI's claim to an ownership interest in the plant.

5. *Enforceability of a judgment.*

The only defendants that have as yet been served, Coastal and DELASA, are domestic corporations. Clearly, it would be easier to enforce against those defendants a judgment of a United States court than a judgment of an El Salvadoran court.

In addition, Coastal has failed to demonstrate sufficiently that a judgment of this court would be unenforceable against La Casa Castro. The declaration of Dr. Saul Litvinoff, submitted by Coastal, states that

... it is doubtful whether a judgment affording relief sought by plaintiffs would be enforced by Salvadoran courts. This is so because ... the object of this suit involves issues regarding title to immovable property located in El Salvador, a subject which, under El Salvador's rules governing private international law, is one which the Salvadoran courts have a special interest in deciding in order to preserve the integrity of the country's registry and land tenure systems.... In addition, in view of the country's interest in the management and efficient utilization of natural resources and rural lands, Salvadoran courts would be quite reluctant to enforce a judgment rendered by a foreign court that touches on this very delicate area of the country's domestic policy. In fact, such a judgment might well be regarded as infringing the sovereignty of El Salvador.

(Litvinoff Decl. ¶¶ 30–31.) However, ESI maintains that it "does not seek to enforce an ownership interest in the physical plant or the property on which it is situated. Rather,

ESI seeks a declaration of its ownership interest in the net cash flow of the project ...." (ESI's Mem. of Law in Opp. to Coastal's Motion to Dismiss the Compl., dated Mar. 20, 1997, at 25.)[11] Moreover, ESI seeks this judgment against any or all defendants jointly and severally. (*See* Am. Compl. ¶ 83.) Thus, even if La Casa Castro is eventually served with process, and even if a judgment of this Court is not enforceable against it in El Salvador, ESI could enforce the judgment against Coastal and/or DELASA.

In addition, Coastal has also failed to demonstrate that an El Salvadoran judgment would be enforceable in the United States against any of the defendants.

### 6. *Other practical problems.*

Coastal asserts that because "most of the records associated with [the] negotiations and agreements for the Nejapa Power Plant are in Spanish, and many of the witnesses are Spanish speaking," trial in this forum would create the added expense of official interpreters and translations. (Coastal Mem. of Law in Support of its Motion to Dismiss the Am. Compl. at 14–15.) However, Coastal has not identified any specific, relevant Spanish-language document that has not already been translated into English. The documents central to this dispute—the Power Purchase Agreement, the Three–Party Agreement, the DELASA–ESI Assignment, and the Trigen–Tenneco Assignment—either were executed in English or already have been translated into English. In any event, Coastal has not demonstrated that the cost of interpreters and translators would be any different if the litigation were conducted in El Salvador.

### 7. *Administrative difficulties arising from court congestion.*

Although the Southern District of New York is one of the busiest judicial districts in the country, this Court anticipates no internal impediments to an expeditious litigation. Moreover, Coastal has not demonstrated that litigation in El Salvador would proceed substantially more swiftly. If anything, having

reviewed the record for purposes of deciding the instant motion, and having presided over the related matter of *IEC v. Trigen,* 944 F.Supp. 1184 (S.D.N.Y.1996), this Court is already familiar with the general factual background and legal issues presented by this case.

### 8. *The local interest in having localized controversies decided at home.*

Although El Salvador has an interest in the ownership of a major El Salvadoran electrical plant, New York has a competing interest in enforcing contracts that were substantially negotiated and at least partly executed in New York.

### 9. *Unfairness of burdening citizens in an unrelated forum with jury duty.*

Because New York has a legitimate interest in this litigation, this factor is not implicated. *See Peregrine,* 89 F.3d at 47.

### 10. *Conflict of laws problems.*

Although it is unclear at this stage which forum's laws will apply to various issues in this action, it appears that foreign law would have to be applied wherever the case is located. *See WMW Machinery,* 960 F.Supp. at 750 (denying *forum non conveniens* motion to dismiss where, *inter alia,* "the courts of either forum would be required to apply foreign law"). The Power Purchase Agreement expressly requires application of El Salvadoran laws; the Three–Party Agreement expressly requires application of New York law. The DELASA–ESI Assignment and the Trigen–Tenneco Assignment were at least partially negotiated, drafted, and executed in New York, suggesting that New York law might apply to those documents. As between the two forums, locating this case in New York would likely minimize the problem of applying foreign law. Even if this Court would be required to apply El Salvadoran law, "it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of

---

**11.** In addressing the issue of *forum non conveniens* in its memorandum in opposition to Coastal's motion to dismiss the amended complaint, ESI refers the Court to this previous memorandum. (*See* ESI Mem. in Opp. to Coastal's Motion to Dismiss the Am. Compl. at 12.)

*forum non conveniens."* *Maganlal,* 942 F.2d at 169.

 Balancing these *Gilbert* factors, the Court concludes that this litigation will impose burdens on both parties regardless of whether it is located in New York or El Salvador. *Cf. Madanes,* 981 F.Supp. at 265–67. Coastal has failed to demonstrate that the *Gilbert* factors weigh strongly in favor of dismissal. Therefore, ESI's choice of forum will not be disturbed, and Coastal's motion to dismiss on the grounds of *forum non conveniens* is denied.

### III. *Failure to State a Claim*

 Coastal also seeks dismissal on the ground that the Amended Complaint fails to state a claim upon which relief may be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must presume all factual allegations in the complaint to be true, and must view them in the light most favorable to the plaintiff. *See Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2nd Cir.1993). The Court may consider only (1) the facts stated on the face of the complaint, (2) documents appended to the complaint, (3) documents incorporated in the complaint by reference, and (4) matters of which judicial notice may be taken. *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2nd Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2nd Cir.1991). "Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### A. *First Claim: Declaratory Judgment*

Where a plaintiff seeks declaratory relief under 28 U.S.C. § 2201, the Court must consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 562 (2nd Cir.1991) (quoting *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)). Whether a real and immediate controversy exists is a matter of degree and must be determined on a case-by-case basis. *Id.* In general, "a declaratory judgment action should be entertained when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue," or "when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 790 (2nd Cir.1986)).

In a nutshell, the parties' positions are as follows. Coastal contends that there is no actual controversy between it and ESI. First, Coastal argues that the Three–Party Agreement did not create any ownership interests in the Project. Rather, it involved nothing more than the "rights to negotiate the [Power Purchase Agreement] with CEL," and that it merely represented the parties' "contemplation ... with respect to the development and ownership of the Project." (Three–Party Agreement, attached as Exh. A to Am. Compl., § 7.) Second, Coastal contends that because the Three–Party Agreement vested no ownership rights, Trigen obtained a 100% ownership interest in the Project when it signed the Power Purchase Agreement. Third, for this reason, DELASA never had any ownership interest to assign to ESI. Fourth, also for this reason, the Trigen–Tenneco Assignment constituted a transfer of a 100% ownership interest under the Power Purchase Agreement. Finally, Coastal asserts that since the Trigen–Tenneco Assignment did not include any rights or obligations under the Three–Party Agreement, neither did Tenneco's transfer of its interest in the Project to Coastal.

In opposition, ESI maintains that there is an actual controversy between it and Coastal, arguing that the issue is not whether Coastal was a successor to the Three–Party Agreement, but whether Coastal is wrongfully withholding ESI's share of the power plant's profits. First, ESI disputes that the Three–Party Agreement vested no rights in the Project. On the contrary, the Three–Party Agreement granted DELASA a 10% share, and La Casa Castro a 15% share, and Trigen a 75% share in the equity of the Project.

(*See* Three–Party Agreement § 4.) Second, the Three–Party Agreement thus limited the ownership interest Trigen obtained when it executed the Power Purchase Agreement. Third, Trigen's ownership interest thus was also limited by ESI's 2.5% equity interest in the Project, which constituted one-quarter of DELASA's 10% ownership interest under the Three–Party Agreement. Fourth, ESI contends that Trigen's assignment to Tenneco of its interest under the Power Purchase Agreement was also subject to the interest ESI had obtained from DELASA. As a precondition to this assignment, Tenneco required, and Trigen obtained, a release from DELASA and La Casa Castro of Trigen's obligations under the Three–Party Agreement. However, ESI asserts, this release could not and did not affect ESI's rights, or Trigen's obligations to ESI, under the Three–Party Agreement. Finally, because Trigen remained bound by ESI's ownership interest under the Three–Party Agreement, the ownership interests of Tenneco (as Trigen's assignee) and Coastal (as Tenneco's successor) also were limited by ESI's 2.5% equity interest.

These arguments make clear that the central dispute between ESI and Coastal concerns the effect of the Three–Party Agreement. In particular, the parties dispute the meaning of Section 7 of the Three–Party Agreement, entitled "Ownership Agreement," which reads in pertinent part as follows:

> The Parties [Trigen, DELASA, and La Casa Castro] acknowledge and agree that at this stage of development, the Project consists solely of the rights to negotiate the PPA [Power Purchase Agreement] with CEL. This Agreement sets forth the present contemplation of the Parties with respect to the development and ownership of the Project. The Parties agree to negotiate in good faith an ownership agreement setting forth fully the rights and obligations of each Party with respect to the Project and its ownership and operation, and it is contemplated that a new company or partnership ... or such other company as agreed upon by the parties ("NEWCO") will be created under the laws of El Salvador (or, if the Parties and CEL agree, under the laws of a state of the United States or another off-shore country selected by the Parties) to construct, own and operate the plant and that the ownership of the equity interest shall be as set forth in Section 4 hereof. The Parties intend that the PPA will be assigned to NEWCO with the approval of CEL. If CEL declines to give its approval to an assignment of the PPA to NEWCO, then an agreement between the Parties relating to construction, ownership and operation of the Project shall, subject to constraints of the PPA, be developed with the equity interest to each of the Parties and distribution mechanism to be as specified in Section 4 and Section 5 hereof.

As stated above, Section 4 specified that the proportionate equity interests in ownership of the Project were to be 10% DELASA, 15% La Casa Castro, and 75% Trigen. Section 5 described the mechanism by which the cash flow from the Project would be distributed.

Coastal and DELASA advance conflicting views of Section 7. Coastal denies that this provision vested any ownership rights in any of the signatories. Rather, it contends that Section 7 was merely an agreement to negotiate, in the future (presumably after Trigen and CEL executed the Power Purchase Agreement), a further agreement establishing the respective ownership rights and obligations of the parties. In this future agreement, equity interests in the project would be as set out in Section 4 of the Three–Party Agreement. However, Coastal asserts, the NEWCO transaction contemplated by the Three–Party Agreement never materialized, and the contemplated future agreement creating proportionate ownership interests in accordance with Section 4 was never formed. Coastal buttresses this interpretation by arguing that the effect of DELASA's and La Casa Castro's release of Trigen from its obligations under the Three–Party Agreement was to terminate that agreement.

In contrast, ESI argues that Section 7 of the Three–Party Agreement vested ownership rights in the signatories. It asserts that the Three–Party Agreement was framed as a "contemplation" because it was necessarily conditional on the final terms of the not-yet-negotiated Power Purchase Agreement. But

though the Three–Party Agreement did not finalize all of the terms and conditions of the parties' arrangement, it did bind the parties to the proportionate equity interests and cash flow distribution mechanism set forth in Section 4 and Section 5. Pursuant to Section 7, the equity structure prescribed by those sections would be incorporated into either (1) a new entity formed to construct, own, and operate the power plant, or (2) a new agreement among the signatories of the Three–Party Agreement regarding the construction, ownership, and operation of the plant.

ESI also points to the Release Agreement—by which DELASA and La Casa Castro released Trigen from its obligations under the Three–Party Agreement—as evidence that the signatories to the Three–Party Agreement intended it to vest ownership rights in the Project which would survive Trigen's execution of the Power Purchase Agreement. According to ESI, if Trigen had truly obtained a 100% ownership interest in the Project by signing the Power Purchase Agreement, there would have been no reason for Tenneco (to whom Trigen was assigning the Power Purchase Agreement) to seek, or for Trigen to obtain, such a release. That Trigen did seek a release from the Three–Party Agreement, and that DELASA and La Casa Castro granted the release, demonstrates that all three signatories understood that the Three–Party Agreement limited Trigen's ownership interest under the Power Purchase Agreement.

Given the language of Section 7 and the facts alleged in the Amended Complaint, the Court cannot say that, as a matter of law, ESI has failed to state a claim for declaratory relief. A jury may well find that although the Three–Party Agreement was a "contemplation" with respect to the development and ownership of the Project, it nevertheless was intended to bind the signatories, in the further agreement anticipated by Section 7,[12] to the proportionate ownership interests set out in Section 4. Therefore, ESI has sufficiently alleged an ownership interest in the Project.

Moreover, based on this alleged ownership interest, ESI has adequately demonstrated an actual controversy between itself and Coastal. Based on the facts alleged in the Amended Complaint and on the language of the Three–Party Agreement, a jury could find: (1) that the Three–Party Agreement bound Trigen, DELASA, and La Casa Castro to the proportionate ownership interests set out in Section 4; (2) that DELASA assigned a portion of its interest to ESI; (3) that the Release Agreement covered only DELASA's and La Casa Castro's rights under the Three–Party Agreement (i.e., that ESI, which did not release the rights it obtained from DELASA, retained a 2.5% ownership interest in the Project and the income from the power plant); (4) that when Trigen assigned its rights under the Power Purchase Agreement to Tenneco, Tenneco received no greater rights than Trigen possessed—that is, Tenneco's ownership interest was similarly limited by ESI's interest;[13]

---

12. Section 7 of the Three–Party Agreement provided, in part, that the signatories would "negotiate in good faith an ownership agreement setting forth fully the rights and obligations of each Party with respect to the Project and its ownership and operation."

13. In arguing that Tenneco, and thus Coastal, possessed an unfettered ownership interest in the Project, Coastal points in part to the language of the Trigen–Tenneco Assignment. That agreement states, in pertinent part:

> ... Trigen agrees to assign to [Tenneco] all of Trigen's rights under and interests to the PPA [Power Purchase Agreement]. Upon such assignment, [Tenneco] agrees to be responsible for Trigen's obligations under the PPA.... Nothing herein shall be construed as an agreement by [Tenneco] to be responsible for any other obligations or liabilities of Trigen relating to or arising from the Project ....

Coastal contends that Trigen possessed a 100% ownership interest in the Project, that the Trigen–Tenneco Assignment gave Tenneco a similarly unfettered interest, and that Coastal, as successor to Tenneco, assumed no liabilities beyond those Tenneco had assumed from Trigen.

Coastal's argument, however, begs the question of just what "Trigen's obligations under the PPA" were. As discussed above, ESI's allegations would support a finding that Trigen's rights under the PPA were limited by the Three–Party Agreement, and thus that its obligations under the PPA included its obligations under the Three–Party Agreement to honor DELASA's, and subsequently ESI's, equity interest in the Project. Arguably, then, as assignee of Trigen's PPA interest, Tenneco's rights similarly would be limited by ESI's rights. It is well-settled that (except in the case of negotiable instruments) an assignee never stands in a better position than the assignor, *see Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 681–82 (2nd Cir.1989); that the

and (5) when Tenneco in turn sold its interest in the Project to Coastal, Coastal also took subject to ESI's ownership interest.

Having demonstrated an actual controversy between itself and Coastal, ESI has stated a cognizable claim for a declaratory judgment. Therefore, Coastal's motion to dismiss is denied with respect to the First Claim.

### B. Second Claim: Third–Party Benefits of the PPA

ESI also seeks damages on the ground that, by virtue of the Three–Party Agreement and the DELASA–ESI Assignment, it is an intended third-party beneficiary of the Power Purchase Agreement entitled to a 2.5% interest in the Project and a proportionate share of the plant's income. A third party may bring an action to enforce a contract if the party is an intended beneficiary of that contract. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2nd Cir. 1991). Under New York law, to which both ESI and Coastal cite, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Restatement (Second) of Contracts § 302(1) (1979); *see Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 5, 485 N.E.2d 208, 212 (1985) (adopting Restatement § 302). However, because the Power Purchase Agreement expressly states that it shall be governed by laws of El Salvador, New York intended beneficiary doctrine may be inapplicable.

 In any event, ESI's reliance on the doctrine is misplaced. The intended beneficiary doctrine permits a third party to recover for breach of a contract, the performance of which was intended to benefit the third party. *See generally* Farnsworth on Contracts § 10 (1990). Here, the Power Purchase Agreement is the contract which is said to have been intended to benefit ESI.

However, there has been no breach of that contract. In essence, the Power Purchase Agreement consists of a promise by Trigen to construct and operate an electrical power plant, and thereafter to sell the facility's electrical output to CEL, and a promise by CEL to pay for that output. Neither promise has been breached. ESI's claim for a share of CEL's payments and other income generated by the plant is not based upon a breach of the Power Purchase Agreement, but upon the obligations allegedly undertaken in the Three–Party Agreement and the DELASA–ESI Assignment. Claims based on breaches of these obligations are asserted in the First, Third, and Ninth Claims.

Therefore, ESI's Second Claim for damages as third-party beneficiary of the Power Purchase Agreement fails to state a cognizable claim, and is dismissed.

### C. Tort Claims

 Coastal seeks dismissal of ESI's tort-based claims on the ground that they are premised upon no more than an alleged breach of contract. Under New York law, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Id.* at 656–57, 70 N.Y.2d at 389, 516 N.E.2d at 194. Put another way, a plaintiff may not recast a contract-based claim as a tort claim "where plaintiff is essentially seeking enforcement of the [contractual] bargain." *In re Chateaugay Corp.*, 10 F.3d 944, 958 (2nd Cir.1993) (quoting *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 961, 593 N.E.2d 1365, 1369 (1992)). ESI's various tort claims will be addressed in turn.

---

assignee takes the assignor's rights subject to superior claims, *see Active Fire Sprinkler Corp. v. United States Postal Serv.*, 811 F.2d 747, 755 (2nd Cir.1987); and that the assignment of a contract does not modify the obligations of the contract, *see Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2nd Cir.1983).

### 1. *Fourth Claim: Tortious Interference with Three–Party Agreement.*

ESI alleges that Coastal intentionally procured DELASA's and La Casa Castro's breach of the Three–Party Agreement. The elements of tortious interference with contractual relations are (1) the existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach the contract; and (4) damages to plaintiff. *Foster v. Churchill*, 87 N.Y.2d 744, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153, 156 (1996); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (1993). Because tortious interference claims are based on acts of third parties, the allegedly tortious conduct constitutes a breach of a legal duty independent of the contract. *See S & S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 489 N.Y.S.2d 478, 480–81, 108 A.D.2d 351, 354–55 (1st Dep't 1985).

The *Clark–Fitzpatrick* doctrine aside, the Amended Complaint fails to state a cognizable claim for tortious interference with the Three–Party Agreement for two reasons. First, in order for a defendant to tortiously interfere with a contract, it must be a "third part[y] unrelated to the contract." *Solow v. Stone*, 994 F.Supp. 173, 181 (S.D.N.Y.1998) (quoting *Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*, 557 N.Y.S.2d 988, 991, 158 A.D.2d 132, 136 (3rd Dep't 1990)). In the instant case, ESI alleges that Coastal was *not* a third party unrelated to the contract allegedly interfered with. ESI seeks to hold Coastal liable for interfering with the Three–Party Agreement, a contract to which Coastal allegedly is bound as successor to Trigen and Tenneco. Second, even if a jury were to disagree with ESI and find that Coastal was not connected with the Three–Party Agreement, that agreement is not a contract "between plaintiff and a third party." Although ESI claims to benefit from the Three–Party Agreement by virtue of the DELASA–ESI Assignment, it does not allege that it was a party to the Three–Party Agreement. Therefore, ESI's Fourth Claim against Coastal for tortious interference with contractual relations fails to state a cognizable claim, and is dismissed.

### 2. *Fifth and Seventh Claims: Conversion and Conspiracy to Convert.*

In the Fifth Claim, ESI alleges that the defendants "intentionally and unlawfully kept ESI's 2.5% interest in the Project and the Plant's income for themselves and thereby converted ESI's income and property." (Am.Compl.¶ 104.) Conversion is "an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 452 N.Y.S.2d 599, 600, 88 A.D.2d 883, 883 (1st Dep't 1982). New York law recognizes an action for conversion of money, but requires the plaintiff to have "ownership, possession or control of the money" before its conversion. *Aramony v. United Way of America*, 949 F.Supp. 1080, 1086 (S.D.N.Y. 1996) (quoting *Peters Griffin Woodward*, 452 N.Y.S.2d at 600, 88 A.D.2d at 884). In addition, "an action for conversion cannot be validly maintained where damages are merely being sought for breach of contract." *Peters Griffin Woodward*, 452 N.Y.S.2d at 600, 88 A.D.2d at 884; *see also Aramony*, 949 F.Supp. at 1086; *Rolls–Royce Motor Cars, Inc. v. Schudroff*, 929 F.Supp. 117, 124 (S.D.N.Y.1996); *MBL Life Assur. Corp. v. 555 Realty Co.*, 658 N.Y.S.2d 122, 124, 240 A.D.2d 375, 376–77 (2nd Dep't 1997).

The Fifth Claim fails to state a cognizable claim for conversion. To begin with, ESI arguably never had "ownership, possession or control of the money" it alleges has been converted. In any event, ESI is claiming that it had an ownership interest by virtue of a contract and that defendants' breach of that contract denied it of that interest. These actions cannot be redressed via a conversion claim. *See Peters Griffin Woodward*, 452 N.Y.S.2d at 600, 88 A.D.2d at 884; *see also In re Chateaugay*, 10 F.3d at 958 (plaintiff may not recast a contract-based claim as a tort claim "where plaintiff is essentially seeking enforcement of the [contractual] bargain") (quoting *Sommer*, 583 N.Y.S.2d at 961, 593 N.E.2d at 1369). Coastal's motion to dismiss is therefore granted with respect to the Fifth Claim.

In the Seventh Claim, ESI also alleges that defendants conspired to convert its in-

terest in the Project. Because, as· discussed above, ESI's Fifth Claim for conversion fails to state a cognizable claim, and because New York does not recognize a substantive tort of conspiracy, *see MBF Clearing Corp. v. Shine*, 623 N.Y.S.2d 204, 205, 212 A.D.2d 478, 478 (1st Dep't 1995), Coastal's motion to dismiss the Seventh Claim is granted.

### 3. Sixth and Eighth Claims: Breach of Fiduciary Duty and Conspiracy to Breach Fiduciary Duty.

The Sixth Claim alleges that by virtue of the Three–Party Agreement and the DELA-SA–ESI Assignment, ESI shared with Coastal, DELASA, and La Casa Castro a fiduciary and confidential relationship as joint venturers in the Project. (Am.Compl.¶¶ 108–11.) It further alleges that defendants "breached their fiduciary duties of loyalty, good faith and fair dealing toward ESI by unlawfully and intentionally excluding and ejecting ESI from the Project, by entering into secret negotiations and sharing agreements concerning the Project, and by converting ESI's 2.5% interest . . . ." (*Id.* ¶ 112.)

In general, "[a] conventional business relationship, without more, does not become a fiduciary relationship by mere allegation." *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 425 (S.D.N.Y. 1992) (quoting *Oursler v. Women's Interart Ctr., Inc.*, 566 N.Y.S.2d 295, 297, 170 A.D.2d 407, 408 (1st Dep't 1991)). "[W]here parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *Id.* (citation omitted); *see also Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985).

However, joint venturers "owe each other a duty of 'finest loyalty' and honesty." *Gramercy Equities Corp. v. Dumont*, 72 N.Y.2d 560, 534 N.Y.S.2d 908, 912, 531 N.E.2d 629, 633 (1988) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928)). ESI has alleged that defendants owed it a duty of undivided loyalty arising from a joint venture relationship created by the Three–Party Agreement. This duty of loyalty, although "connected with and dependent upon" the allegedly breached contract, *Clark–Fitzpatrick*, 521 N.Y.S.2d at 657, 516 N.E.2d at 194, existed independently of the duty to fulfill the contract obligations. *See Schneider v. Green*, No. 88 Civ. 2931, 1990 WL 151142, at \*14–15 (S.D.N.Y. Oct. 1, 1990) (joint venturer's duty of loyalty existed independently of contractual duty); *see also Supra USA Inc. v. Samsung Electronics Co.*, No. 85 Civ. 9696, 1987 WL 19953 (S.D.N.Y. Nov.10, 1987); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 639 N.Y.S.2d 283, 287, 662 N.E.2d 763, 767 (1995); *Clark–Fitzpatrick*, 521 N.Y.S.2d at 657, 516 N.E.2d at 194 (citing *Rich v. New York Cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382, 395 (1882)). Therefore, ESI's Sixth Claim does not impermissibly duplicate its contract claims, and Coastal's motion to dismiss this claim is denied.

In the Eighth Claim, ESI also alleges that the defendants conspired to breach their duty of loyalty. However, because conspiracy, in and of itself, is not a substantive tort, *see MBF Clearing Corp.*, 623 N.Y.S.2d at 205, 212 A.D.2d at 478, ESI's Eighth Claim is merely duplicative of its Sixth Claim. *See Artco, Inc. v. Kidde, Inc.*, No. 88 Civ. 5734, 1989 WL 140284, at \*7 (S.D.N.Y. Nov. 15, 1989) (claim for conspiracy to breach fiduciary duty duplicative of claim for tortious inducement of breach of fiduciary duty) (citing *Norris v. Grosvenor Mktg. Ltd.*, 803 F.2d 1281 (2nd Cir.1986)). The Eighth Claim is therefore dismissed.

### 4. Tenth and Eleventh Claims: Tortious Interference, and Conspiracy to Tortiously Interfere, with the DELASA–ESI Assignment.

The Tenth Claim alleges that Coastal and La Casa Castro tortiously interfered with the DELASA–ESI · Assignment. As noted above, tortious interference claims may be maintained alongside ·underlying contract claims. *See S & S Hotel Ventures*, 489 N.Y.S.2d at 480–81, 108 A.D.2d at 354–55. Moreover, the Amended Complaint sufficiently pleads the elements of this tort. *Cf. Foster*, 642 N.Y.S.2d at 586, 665 N.E.2d at

156. Therefore, with respect to the Tenth Claim, Coastal's motion to dismiss is denied.

However, ESI's allegation of conspiracy to tortiously interfere with the DELASA–ESI Assignment simply duplicates the underlying tortious interference claim. *Cf. Artco,* 1989 WL 140284, at *7. Accordingly, Coastal's motion to dismiss is granted with respect to ESI's Eleventh Claim.

 5. *Claim Fourteen: Prima Facie Tort.* In the Fourteenth Claim, for prima facie tort, alleges that defendants intentionally inflicted harm on ESI. Under New York law, there are four elements to a prima facie business tort claim: (1) an intentional infliction of harm, (2) without excuse or justification and motivated solely by malice, (3) resulting in special damages, (4) by acts that would otherwise be lawful. *United States v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 161 (2nd Cir.1996) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 720, 451 N.E.2d 459, 467 (1983)). Prima facie tort is not a " 'catch-all' alternative for every cause of action which cannot stand on its legs." *Lindner,* 464 N.Y.S.2d at 720, 451 N.E.2d at 467 (citation omitted).

 The Amended Complaint fails to state a cognizable claim for prima facie tort. To begin with, "there is no recovery in prima facie tort unless malevolence is the sole motive for defendant's otherwise lawful act ...." *Id.* at 721, 464 N.Y.S.2d 712, 451 N.E.2d at 468; *see also IBM Credit Financing Corp. v. Mazda Motor Mfg. (USA) Corp.,* 542 N.Y.S.2d 649, 651, 152 A.D.2d 451, 453 (1st Dep't 1989). Although ESI alleges that defendants' conduct was intentional and without excuse or justification, it does not allege that they were motivated solely by malevolence. *See id.* ("Here the prima facie tort causes of action cannot stand because, although they allege intentional and malicious action, they do not allege that defendants' sole motivation was 'disinterested malevolence.' ").

 In addition, although ESI has alleged "special damages in an amount to be established at trial," (Am.Compl.¶ 163), this conclusory allegation is insufficient to sustain a prima facie tort claim. To survive a motion to dismiss, a prima facie tort claim must allege special damages with specificity. *See Merritt Meridian,* 95 F.3d at 161; *see also World Wide Communications, Inc. v. Rozar,* No. 96Civ.1056, 1997 WL 795750, at *10 (S.D.N.Y. Dec.30, 1997) (collecting cases). Pleading special damages requires "a particularized statement of the reasonable, identifiable and measurable" loss. *Gray v. Grove Mfg. Co.,* 971 F.Supp. 78, 81 (E.D.N.Y.1997) (quoting *Nu–Life Constr. Corp. v. Board of Educ. of City of New York,* 611 N.Y.S.2d 529, 531, 204 A.D.2d 106, 108 (1st Dep't 1994)). Even "[r]ound figures with no itemization do not satisfy" the pleading requirement. *Id.; see also Merritt Meridian,* 95 F.3d at 161. Here, ESI has done no more than flatly assert special damages, without any attempt to identify the nature or amount of those damages.

Indeed, the special damages claimed are nothing more than the general contract damages sought elsewhere in the Amended Complaint. ESI's prima facie tort claim relates solely to defendants' alleged contractual breaches, and must be dismissed. *See id.* at 162 ("[W]e do not think that the restrictions upon damages for breach of contract claims can be avoided merely by recasting the breach as a [prima facie] tort.... Here the [prima facie] tort claim relates solely to breach of a bargain, egregious though it may have been. Simply put, this is one of those contract cases which cannot be converted into a business tort ...."); *see also World Wide Communications,* 1997 WL 795750, at *10; *Shifa Servs., Inc. v. Port Auth. of New York and New Jersey,* No. 96 Civ. 1361, 1997 WL 16062, at *9 (S.D.N.Y. Jan. 15, 1997).

### D. *Remaining Claims*

Coastal seeks dismissal of the two remaining claims against it—the Twelfth Claim for a constructive trust and the Thirteenth Claim for unjust enrichment—on the ground that they too are contract-based claims masked as tort claims. However, neither unjust enrichment nor constructive trust sound in tort. Unjust enrichment is a quasi-contractual doctrine, *see In re Chateaugay,* 10 F.3d at 958; *Clark–Fitzpatrick,* 70 N.Y.2d at 388–89, 521 N.Y.S.2d at 656, 516 N.E.2d at 193, while constructive trust is an equitable remedy, *see Oneida Indian Nation of New York v. State*

*of New York,* 691 F.2d 1070, 1096 (2nd Cir. 1982); *Simonds v. Simonds,* 45 N.Y.2d 233, 408 N.Y.S.2d 359, 363, 380 N.E.2d 189, 193 (1978). Regardless, the Amended Complaint states cognizable claims for both unjust enrichment and constructive trust.

### 1. *Thirteenth Claim: Unjust Enrichment.*

ESI alleges that by receiving all of the Plant's income and profits, defendants are being unjustly enriched. To state a cause of action for unjust enrichment, a plaintiff must allege facts demonstrating that a defendant has been enriched at plaintiff's expense, and that retention of the benefit would be unjust. *Hutton v. Klabal,* 726 F.Supp. 67, 72 (S.D.N.Y.1989); *Mayer v. Bishop,* 551 N.Y.S.2d 673, 675, 158 A.D.2d 878, 880 (3rd Dep't 1990). The doctrine of unjust enrichment does not require wrongful conduct by the one enriched. *Chemical Bank v. Equity Holding Corp.,* 644 N.Y.S.2d 709, 710, 228 A.D.2d 338, 339 (1st Dep't 1996) (citing *Simonds,* 408 N.Y.S.2d at 364, 380 N.E.2d at 194). ESI has adequately plead the elements of this cause of action.

■ However, unjust enrichment is a quasi-contractual doctrine that applies only in the absence of a valid and enforceable contract. *In re Chateaugay,* 10 F.3d at 958; *Clark–Fitzpatrick,* 521 N.Y.S.2d at 656, 516 N.E.2d at 193. Although ESI asserts that its ownership interest in the Project springs from two written contracts—the Three–Party Agreement and the DELASA–ESI assignment agreement—Coastal disputes the validity and enforceability of these contracts. Should a jury decide that these contracts did not grant ESI enforceable rights against the defendants, ESI could still seek recovery on the alternative, quasi-contract theory of unjust enrichment. *See* Fed.R.Civ.P. 8(e)(2) (permitting alternative, and even inconsistent, pleading); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 343 (2nd Cir.1994) (discussing Rule 8(e)(2)). Coastal's motion to dismiss is accordingly denied with respect to the Thirteenth Claim.

### 2. *Twelfth Claim: Constructive Trust.*

■ ESI also seeks an accounting of the Plant's income and expenses and ESI's proportionate share of the net income, and the imposition of a constructive trust on that income. ESI's constructive trust claim is essentially an alternative, equitable remedy to contract damages. Even if a jury were to find that the Three–Party Agreement did not create any vested ownership rights, and therefore that Coastal did not breach that contract, ESI might nevertheless be able to recover based on the equitable remedy of constructive trust. As noted above, the Federal Rules of Civil Procedure permit such alternative pleading. *See* Fed.R.Civ.P. 8(e)(2); *Riverwoods,* 30 F.3d at 343.

■ A "constructive" trust is an equitable remedy, not a legal relationship. *Oneida Indian Nation,* 691 F.2d at 1096; *Simonds,* 408 N.Y.S.2d at 363, 380 N.E.2d at 193. It has been described as "the formula through which conscience of equity finds expression." *Republic of Philippines v. Marcos,* 806 F.2d 344, 355 (2nd Cir.1986) (quoting *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.)). As such, "[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Id.* (quoting *Beatty,* 225 N.Y. at 386, 122 N.E. at 380). In short, "[a] constructive trust will be erected whenever necessary to satisfy the demands of justice." *Id.* (quoting *Simonds,* 408 N.Y.S.2d at 363, 380 N.E.2d at 194).

■ More specifically, New York law generally requires that a party establish four elements before a constructive trust may be imposed: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; (4) and unjust enrichment. *Brand v. Brand,* 811 F.2d 74, 77 (2nd Cir.1987); *Sharp v. Kosmalski,* 40 N.Y.2d 119, 386 N.Y.S.2d 72, 75, 351 N.E.2d 721, 723 (1976). Similarly, the right to an accounting is premised upon the breach of a confidential or fiduciary relationship with respect to property in which the plaintiff has an interest. *See Adam v. Cutner & Rathkopf,* 238 A.D.2d 234, 241–42, 656 N.Y.S.2d 753, 759 (1st Dep't 1997). These elements, however, are not talismanic;

a court may impose a constructive trust in the absence of some of the factors. *United States v. Coluccio*, 51 F.3d 337, 340 (2nd Cir.1995); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352–53 (2nd Cir.1992); *Simonds*, 408 N.Y.S.2d at 363, 365, 380 N.E.2d at 194, 195.

ESI adequately alleges the elements of a constructive trust claim, with the possible exception of the third element—a transfer made in reliance on a promise. ESI alleges that "[i]n detrimental reliance on the defendants' express and implied promises, ESI's rights and interest in the Project and its proportionate share of the Plant's income were wrongfully and unlawfully transferred to" the defendants. (Am.Compl.¶ 146.) Despite this allegation, ESI has alleged no facts demonstrating any actual transfer. Nevertheless, the absence of this factor is not fatal to ESI's claim. As noted above, "[a]lthough the factors are useful in many cases, constructive trust doctrine is not rigidly limited .... What is required, generally, is that a party hold property 'under such circumstances that in equity and good conscience [it] ought not to retain it.'" *Simonds*, 408 N.Y.S.2d at 364, 380 N.E.2d at 194 (citation omitted). Therefore, with respect to the Twelfth Claim for an accounting and constructive trust, Coastal's motion to dismiss is denied.

### CONCLUSION

For the reasons stated above, Coastal's motion to dismiss is granted in part and denied in part as follows. With respect to the grounds of improper venue and *forum non conveniens*, the motion is denied. With respect to the Rule 12(b)(6) grounds, the motion is granted as to the Second, Fourth, Fifth, Seventh, Eighth, Eleventh, and Fourteenth Claims, and denied as to the First, Sixth, Tenth, Twelfth, and Thirteenth Claims. The Third Claim—which was not included in Coastal's motion to dismiss—and the Ninth Claim—which is asserted against DELASA only—also remain.

SO ORDERED.